IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MONTERIAL WESLEY (02), | ) | |
| RTAYVIAN SIMPSON (03), | ) | Case No. 07-20168-JWL |
| SHEVEL M. FOY (04), | ) | |
| HENRY GRIGSBY (05), | ) | |
| JAMES HEAGS (08), | ) | |
| HAROLD WALLACE (13), | ) | |
| LAKELA HOUFF (14), | ) | |
| BILLY TRINKLE (15), | ) | |
| LATYSHA D. TEMPLE (20), | ) | |
| KEITH McDANIEL (22), | ) | |
| FRANKLIN GOODWIN, JR., (24) | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**<u>MEMORANDUM AND ORDER</u>**

On Wednesday, February 4, 2009, the court held a motion hearing in *United States v. Wesley*, Case No. 07-20168, taking up various motions related to discovery matters[1] and several motions to suppress electronic surveillance.[2]  This case involves a

_____

[1] The court issued an order (Doc. 592) on February 6, 2009 memorializing its handling of the various discovery motions.

[2]  Shevel Foy (Doc. 454) challenged the validity of the intercepts on 913-290-0995 (Target Phone #3) and 816-337-9507 (Target Phone #4).  Various defendants joined Mr. Foy's motion to suppress, including: Keith McDaniel (Doc. 537), Billy

(continued...)

year and a half investigation, including four months of wiretap interceptions. The superseding indictment (Doc. 50) filed on February 1, 2007 charges thirty-nine counts.[3] All of the defendants are charged in count 1 with conspiracy to manufacture, possess with intent to distribute, and distribute fifty grams or more of cocaine base and five kilograms or more of cocaine. Each defendant is also charged with at least one other substantive count.

---

[2](...continued)
Trinkle (Doc. 538), James Heags (Doc. 542), Shannon Perez (Doc. 570), and Franklin Goodwin (Doc. 572).

Henry Grigsby (Doc. 462) challenged the validity of the intercepts on 501-393-6129 (Target Phone #1) and 913-206-7165 (Target Phone #2). Mr. Goodwin (Doc. 572) joined Mr. Grigsby's motion to suppress.

Michael Clark (Doc. 414) challenged the validity of the intercepts on 913-206-7165 (Target Phone #2) and 913-290-0995 (Target Phone #3). While Mr. Clark has subsequently pled, various defendants joined his motion to suppress: Monterial Wesley (Doc. 450 and 451), Jamicah Johnson (Doc. 455), Harold Wallace (Doc. 516), Mr. McDaniel (Doc. 537), Mr. Trinkle (Doc. 538), Mr. Heags (Doc. 542), Latysha Temple (Doc. 549) and Mr. Goodwin (Doc. 572). Therefore, the court took the substance of Mr. Clark's motion under advisement because various co-defendants joined his motion to suppress before his plea. For ease of reference, the court will refer to Mr. Clark's motion to suppress, rather than the various joinder motions, when addressing the arguments contained within his motion.

Donnie Johnson (Doc. 445) challenged the validity of the intercepts on 913-206-7165 (Target Phone #2). While Mr. Johnson has subsequently pled, various defendants joined his motion to suppress: Mr. Wesley (Doc. 450 and 451), Jamicah Johnson (Doc. 455), Mr. Wallace (Doc. 516), Mr. Trinkle (Doc. 538), Ms. Temple (Doc. 549) and Mr. Goodwin (Doc. 572). Therefore, the court took the substance of Mr. Johnson's motion under advisement because various co-defendants joined his motion to suppress before his plea. For ease of reference, the court will refer to Mr. Johnson's motion to suppress, rather than the various joinder motions, when addressing the arguments contained within his motion.

[3]At the time of the motions hearing on February 4, 2009, only eleven of the original twenty-four defendants named in the superseding indictment remained.

The defendants make three arguments attacking the validity of the intercepted wire communications. First, the defendants claim the government violated 18 U.S.C. § 2516(1) by failing to provide the authorizing judge, Judge Carlos Murguia, with correct information concerning which federal authority approved its applications for intercepted wire communications. Second, there is a claim by Mr. Foy (Doc. 454) that because one of the applications (Target Phone # 3) incorrectly identifies the affiant, the authorization is invalid. Finally, the defendants all assert various arguments that the government's application failed to meet the "necessity" requirement of 18 U.S.C. § 2518(1)(c). Having considered the written and oral arguments presented by the parties, the court, for the reasons discussed below, denies the motions to suppress electronic surveillance.

**DISCUSSION**

*1. Federal Authority Under 18 U.S.C. § 2516(1)*

Under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2522, the Attorney General or a duly empowered high-ranking subordinate must review and approve wiretap requests before an application to intercept wire or oral communications is filed with the district court. *See* 18 U.S.C. § 2516(1). The application with the court "shall state the applicant's authority to make such application," *id.* § 2518(1), and must include "the identity of. . .the officer authorizing the application." *Id.* § 2518(1)(a).

"The Attorney General, Deputy Attorney General, Associate Attorney General, or any Assistant Attorney General, any acting Assistant Attorney General, or any Deputy

3

Assistant Attorney General or acting Deputy Assistant Attorney General in the Criminal Division or National Security Division specially designated by the Attorney General, may authorize" a wiretap application. *Id.* § 2516(1). The Attorney General delegates the authority to approve wiretap applications to selected officials using Attorney General Orders. Therefore, to substantiate that the wiretap applicant has the "authority to make such application" as required by 18 U.S.C. § 2518(1), the government in its wiretap application must reference the specific Attorney General Order currently in effect that delegates the authority.

Each of the motions to suppress electronic surveillance present the argument that the government failed to establish "the requisite 2516(1) authorization." Mr. Clark's Motion to Suppress, Doc. 414, at ¶ 4. *See also* Mr. Foy's Motion to Suppress, Doc. 454, at 3-4; Mr. Grigsby's Motion to Suppress, Doc. 462, at 3-4; Mr. Johnson's Motion to Suppress, Doc. 445, at ¶ 3. The government in this case concedes that it referenced in several wiretap applications[4] the incorrect Attorney General Order, however, it argues "this error was ministerial in nature and clearly did not frustrate Congress's purpose in limiting wiretaps by requiring applications to be authorized by a high-level, politically

---

[4]The initial applications which were made to Judge Murguia with regards to Target Phones # 1 and # 2 on August 1, 2007, and the applications for the extensions, which were made on August 30, 2007; the initial application for Target Phone # 3 on August 10, 2007, and the application for extension, which was made on September 7, 2007; and, the initial application for Target Phone # 4 on August 28, 2007, and the application for the extension, which was made on October 1, 2007, referenced the expired order.

accountable Department of Justice official, therefore suppression would be unwarranted." "Government's Response to Defendants' Motions to Suppress Evidence Obtained From Electronic Surveillance," Doc. 498, at 2.  In these applications, the government cited Attorney General Order No. 2758-2005, which had been revoked and replaced by Order No. 2887-2007.[5]  The government explains that because the Office of Enforcement Operations was not notified that Order 2758-2005 had been revoked and replaced, "wiretap applications and reauthorizations submitted to courts all over the country from July 5, 2007 to October 23, 2007, referenced an expired Attorney General Order in substantiating that a duly empowered official had authorized the wiretap." *Id.* at 4.  Upon being notified concerning the expired order, the government filed a Notice of Change in Authorizing Order on October 31, 2007 to Judge Murguia for Target Phones # 1-4.[6]

The government argues that "the key inquiry is whether the Government has failed to satisfy 'any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary device.'" *Id.* at 7.  The

---

[5]  On July 3, 2007, Attorney General Alberto Gonzales signed a new order, Attorney General Oder No. 2887-2007, expanding the list of designated officials authorized to approve wiretap applications to include selected officials in the newly created National Security Division.  However, while the new order did not change the Criminal Division officials authorized to approve wiretap application, it did revoke Order 2758-2005 effective midnight July 4, 2007.

[6]*See* Government's Exhibits 1-4.

government is correct that not every noncompliance with a Title III requirement mandates suppression. *See, e.g., United States v. Chavez*, 416 U.S. 562, 570 (1974) (Suppression was not required even though "[t]he application and order for the Chavez wiretap did not correctly identify the individual authorizing the application as 18 U.S.C. § 2518(a) and 4(d) require" because the Attorney General had in fact authorized the application.). *But see United States v. Giordano*, 416 U.S. 505 (1974) (holding suppression was required where the application was "in fact, not authorized by one of the statutorily designated officials"). The error in this case is like the error in *Chavez.* Although the application referenced the incorrect Attorney General Order, the person authorizing the wiretap application had the authority to approve wiretap applications. Minor errors in a wiretap application or order do not warrant suppression. *See, e.g.*, *United States v. Callum*, 410 F.3d 571, 576 (9th Cir. 2005) (suppression not required where the government's application did not list an authorizing official, where in fact, a proper official had given authorization); *United States v. Fudge*, 325 F.3d 910, 918 (7th Cir. 2003) (refusing to suppress evidence even though order granting the wiretap application did not identify the authorizing DOJ official); *United States v. Radcliff*, 331 F.3d 1153, 1160-63 (10th Cir. 2003) (refusing to suppress evidence where wiretap order listed every DOJ official by tittle with legal authority to authorize applications rather than the official who authorized the particular application); *United States v. London*, 66 F.3d 1227, 1232-33 (1st Cir. 1995) (denying motion to suppress where a signature page for an official who was not statutorily empowered to authorize a wiretap application was

6

attached when in fact a statutorily-empowered official had authorized the application and the first page of the letter identified that official).

Other district courts have considered this very issue and have found that this type of error did not merit suppression. *See, e.g., United States v. Lopez*, 2008 WL 2156758 (C.D. Cal. May 19, 2008) (dismissing the impact of citing an expired designation order); *United States v. Tinnin*, 2008 WL 1786991, at *9 (D. Minn. Apr. 17, 2008) ("The application's mere reference to a revoked designation order, when a new order containing the same authorizations was in place, did not compromise the statutory scheme so as to make the interception unlawful."); *United States v. Mainor*, 2007 WL 2702810 (E.D. Pa. Sept. 12, 2007) (dismissing the impact of citing an expired designation order).  Therefore, the defendants' argument that referencing the incorrect Attorney General Order invalidates the approval of the applications is unpersuasive; and the evidence gathered from electronic surveillance cannot be suppressed on this ground.

*2. Misidentification of the Affiant in Initial Application for Target Phone # 3*

In his motion to suppress, Mr. Foy explains that the application for Target Phone # 3 states it relied upon the affidavit of Special Agent Tim McCue; however, the government filed an affidavit of Task Force Officer Eric D. Jones in association with the application for Target Phone # 3.[7]  Mr. Foy argues that "[t]he failure to supply the Court

---

[7]*Compare* Government's Exhibit 6, Application for Interception of Wire Communications for Target Phone # 3 (dated Aug. 10, 2007), at ¶ 5 (identifying Special Agent Tim McCue as affiant) *with* Government's Exhibit 7, Affidavit in Support of
(continued...)

with the affidavit of Special Agent McCue when the Government filed its Application and the Court's failure to require the affidavit of Special Agent McCue before entering its Order requires suppression pursuant to 18 U.S.C. [§] 2518(10)(a)(i)and(ii)."  Mr. Foy's Motion to Suppress, Doc. 454, at 7.  In its response, the government explains that the reference to Special Agent McCue was in error and the true preparer of the affidavit associated with this application was Task Force Officer Jones. Mr. Foy does not cite any additional authority beyond referencing 18 U.S.C. § 2518(10)(a)(i) and (ii) for the proposition that this error in the application merits suppression of the evidence from the electronic surveillance of Target Phone # 3.  The statutory provisions cited by Mr. Foy allow for suppression if the communication was unlawfully intercepted or if the order of authorization or approval under which it was intercepted is insufficient on its face.

Here, the government misidentified the name of the affiant in its initial application for Target Phone # 3.  The government argues that "this was nothing []other than a minor ministerial/typographical error that in no way impacted the validity of the wire authorization." "Government's Response to Defendants' Motions to Suppress Evidence Obtained from Electronic Surveillance," Doc. 498, at 12.  In his motion to suppress, Mr. Foy did not specifically identify which provision of 18 U.S.C. § 2518(1) or 18 U.S.C. § 2518(3) was not satisfied.  The affidavit itself properly identified the officer who

---

[7](...continued)
Application for Order Authorizing Interception of Wire Communications for Target Phone # 3 (dated Aug. 10, 2007), at ¶ 1 (identifying Task Force Officer Eric D. Jones as affiant).

8

prepared it; the only problem in the application was a misidentification of this officer's name.[8]  It matters little whether this typographical error is analyzed as a grounds for suppression under 18 U.S.C. § 2518(10)(a)(i) or (ii) as the analysis of both provisions is essentially the same.  The key question remains whether the government failed to satisfy "any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary device."  *Giordano*, 416 U.S. at 527.  "Even where a wiretap application is found to be 'unlawful' under 10(a)(i), suppression is not required if the violated provision of Title III 'does not establish a substantive role to be played in the regulatory system.'"  *Radcliff*, 331 F.3d at 1162 (quoting *Chavez*, 416 U.S. at 578).  The Tenth Circuit in *Radcliff* extended this same reasoning to 18 U.S.C. § 2518(10)(a)(ii).  *Id.*  The error here clearly did not frustrate Congress's purpose in ensuring that wiretaps only be undertaken if "other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c).  Therefore, suppression is not warranted,  and the court denies Mr. Foy's motion to suppress on this basis.

*3. Necessity Under 18 U.S.C. § 2518(1)(c)*

Finally, each motion to suppress argues that the government failed to establish

---

[8]As the government pointed out in its response to the defendant's motion to suppress and at the motions hearing, both Special Agent McCue and Task Force Officer Jones were working on the case; and both, at different times, prepared affidavits in support of various wiretap applications.

that electronic surveillance was a matter of "necessity" because traditional investigative techniques were insufficient.  *See* Mr. Clark's Motion to Suppress, Doc. 414, at ¶¶ 6-8; Mr. Foy's Motion to Suppress, Doc. 454, at 4-7; Mr. Grigsby's Motion to Suppress, Doc. 462, at 4-7; Mr. Johnson's Motion to Suppress, Doc. 445, at ¶¶ 5-7.

Title III sets out a specific application procedure for federal investigators seeking permission to wiretap crime suspects.  *United States v. Small*, 423 F.3d 1164, 1172 (10th Cir. 2005).  A judge may approve a wiretap application and authorize a wiretap order only if, among other things, "the wiretap is 'necessary' to investigate a serious offense enumerated on a statutory list."  *United States v. VanMeter*, 278 F.3d 1156, 1159 (10th Cir. 2002).  "This requirement is intended to ensure that the relatively intrusive device of wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime."  *United States v. Iiland*, 254 F.3d 1264, 1267 (10th Cir. 2001) (quotations omitted); *see also United States v. Edwards*, 69 F.3d 419, 429 (10th Cir. 1995).  "If an application was granted without meeting the necessity requirement, the wiretap evidence must be suppressed.  *Iiland*, 254 F.3d at 1267 (quotations omitted).  The wiretap orders are presumed valid, and defendants bear the burden of proof to show otherwise.  *Radcliff*, 331 F.3d at 1160; *United States v. Smart*, 278 F.3d 1168, 1172 (10th Cir. 2002); *Iiland*, 254 F.3d at 1268.

The wiretap application is required to contain a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C.

§ 2518(1)(c). This rule is known as the "necessity" requirement. *See United States v. Mondragon*, 52 F.3d 291, 293 (10th Cir. 1995). The authorizing judge must similarly find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." *Id.* § 2518(3)(c); *accord Small*, 423 F.3d at 1172 (quoting the statute). Traditional investigative techniques include standard visual and aural surveillance, questioning and interrogation of witnesses or participants (including the use of grand juries and the grant of immunity if necessary), use of search warrants, infiltration by undercover agents or informants, pen registers, and trap and trace devices. *United States v. Cline*, 349 F.3d 1276, 1280 (10th Cir. 2003); *see also United States v. Killingsworth*, 117 F.3d 1159, 1163 (10th Cir. 1997). If the government has not tried these traditional techniques, it must explain the failure with particularity. *Cline*, 349 F.3d at 1280. Generalities, or statements in conclusory language of the statute, are insufficient to support a wiretap application; the statements must be factual and they must specifically relate to the individuals being targeted by the wiretap. *Id.* at 1280-81. The court must consider all the facts and circumstances and read the necessity requirement in a common sense fashion, *id.* at 1281, rather than hypertechnically, *Smart*, 278 F.3d 1172.

Here, the defendants challenge the validity of the wiretap authorizations on Target Phone # 1 (510-393-6129), Target Phone # 2 (913-206-7165), Target Phone # 3 (913-290-0995) and Target Phone # 4 (816-337-9507). Mr. Clark moves for the suppression of the evidence derived from Target Phones # 2 and # 3, specifically arguing that,

11

contrary to the government's contentions, "traditional investigative tools were viable, workable and working;" the government "had not even tried other, conventional means of investigation;" and "the government misrepresented its case before the authorizing Judge by omitting information which would have undercut the necessity argument." Mr. Clark's Motion to Suppress, Doc. 414, at ¶¶ 7, 8, 9. Mr. Foy moves for the suppression of evidence derived from Target Phones # 3 and # 4, arguing that "the overly broad" description in the affidavits "was not supported by enough substantial facts to support the 'necessity' requirement." Mr. Foy's Motion to Suppress, Doc. 454, at 7. Mr. Grigsby moves for the suppression of evidence derived from Target Phones # 1 and # 2, also arguing that the traditional methods were working and that the government had failed to show why these methods were too dangerous to continue. Mr. Grigsby's Motion to Suppress, Doc. 462, at 5-6. Finally, Mr. Johnson moves for the suppression of evidence from Target Phone # 2, similarly arguing that the normal investigative techniques were working and that the government omitted information regarding the success of its investigation to that point because it would have undercut its necessity argument to the authorizing judge. Mr. Johnson's Motion to Suppress, Doc. 445, at ¶¶ 6-8. The court has carefully reviewed the wiretap applications, affidavits, and orders associated with these target phones and the court finds that the defendants have not rebutted the presumption that the wiretap orders were valid.

**A. Target Phones 1 and 2[9]**

The initial affidavit[10] submitted in support of the applications is thirty-seven pages in length and describes in detail the investigation of an organization that was believed to be distributing large amounts of cocaine and crack cocaine in the Leavenworth, Kansas and Kansas City metropolitan areas.[11] The affidavit describes the people likely to be intercepted and gives their criminal histories, and then details the basis of the probable cause for the request. The affidavit details extensively the interactions of various confidential informants with certain members of the organization. For example, Confidential Source #1 (CS#1) explained that Monterial Wesley heads the cocaine trafficking operation in the Leavenworth/Kansas City metropolitan area and this organization distributes kilogram and multiple ounce quantities of cocaine and crack on

---

[9]The government presented a combined affidavit for the initial authorization and any continuing authorizations for these two target phones as defendant Henry Grigsby was the primary user on both.

[10]*See* Government's Exhibit 8, Affidavit in Support of Application for Order Authorizing Interception of Wire Communications for Target Phones # 1 and # 2 (dated Aug. 1, 2007).

[11]The affidavit in support of an extension of the order authorizing the wiretapping of Target Phones # 1 and # 2 is forty-one pages in length and, while incorporating the previous affidavit, added information that had been gained from the initial wiretap, detailing various conversations concerning drug trafficking and explaining that "[w]ire intercepting activities to date provided details regarding the structure of the organization; the methods of transportation, and distribution of illegal drugs; the identities of organizational associates and co-conspirators; the drug trafficking relationships and roles of those organizational associates and co-conspirators; and the suspected identification of the illegal drugs being distributed." *See* Government's Exhibit 11, Affidavit in Support of Application for Extension of Order Authorizing Interception of Wire Communications for Target Phones # 1 and #2 (dated Aug. 31, 2007).

13

a daily basis.  CS#1 further explained that Mr. Wesley uses family members and known associates to do the actual distribution, but he sets up the transactions using his cell phone and directs others to deliver narcotics.  CS#1 advised officers that it was useless to pull Mr. Wesley's trash as "he's on to you."  Government's Exhibit 8, at ¶ 21.  The affidavit details that the investigation currently had five different confidential sources, several of whom had purchased drugs from different members of the organization in the past.  The affidavit then goes on to describe a number of attempted and successful controlled purchases.

The affidavit explains that on June 11, 2007  pen registers were authorized on both of Mr. Grigsby's cellular phones (Target Phones # 1 and # 2).  These tolls were combined with administrative subpoena results that were also issued for both numbers. Telephone call detail and caller identification analysis completed on these records from March 13, 2007 to July 25, 2007 revealed that Target Phone # 1 had contact with three identified phones of co-defendant Monterial Wesley, a large-scale cocaine and marijuana distributor in Leavenworth and Kansas City, Missouri, on eight-one (81), thirty-one (31), and forty-three (43) occasions respectively.  Similar analysis of the records revealed that Target Phone # 2 had contact with a phone number belonging to Keenan Ringgold, identified as a distributor of cocaine and "crack" cocaine for Mr. Grigsby, on one hundred sixty-nine (169) occasions.  Analysis of the records revealed that Target Phone # 2 had contact with a telephone number belonging to co-defendant James Heags, identified as an associate who provides a stash location for Mr. Grigsby, on four hundred

14

eighty (480) occasions.  Analysis of the records also revealed that Target Phone # 2 had contact with a number utilized by Paul Lockwood, identified by CS#5 as a distributor of cocaine and transporter of cocaine for Jerry Davis from Wichita to Leavenworth, on thirty-six (36) occasions and with a number whose subscriber was Michael Admiral, previously a target of an investigation where he was subsequently arrested and convicted for distributing cocaine, on forty-six (46) occasions.[12]  Based on these results, the affidavit states that Mr. Grigsby uses these phones to facilitate the sale of cocaine and talk with individuals who are known to be associated with the distribution of illegal narcotics.  The affidavit explains that the "agents have not identified all the sources of supply for this organization nor the locations used by the organization for the storage of drugs or the monies derived from the sale of drugs." *Id.* at ¶ 59.  It opines that wiretapping Mr. Grigsby's phones in particular will help successfully identify and subsequently dismantle the entire organization.  As detailed in the affidavit and discussed by Special Agent McCue at the hearing, mere knowledge of the incoming and outgoing phone numbers does not necessarily reveal the true identity of the callers and obviously does not reveal the content of the phone conversations. *See id.* at ¶ 75.

The affidavit explains that "investigative techniques that are usually employed in the investigation of this type of criminal case have been tried and have failed, reasonably

---

[12]The affidavit also details various phone numbers with which Target Phones # 1 and # 2 had significant contact, but for which the government had not identified the presumed user or subscriber.  *See* Government's Exhibit 8, at ¶¶ 53, 55.

appear to be unlikely to succeed if they are tried, or are too dangerous to employ." *Id.* at ¶ 60. Physical surveillance had been conducted with "limited success." *Id.* at ¶ 61. For example, on June 18, 2007, Mr. Grigsby, while waiting at a red light at the intersection of Delaware and Fifth Street, exited his vehicle and "waved-off" a surveillance unit that was directly behind his vehicle. *Id.* at ¶ 63. On another occasion, on April 17, 2007, agents were conducting surveillance of Mr. Grigsby at a tax service in Leavenworth. Upon beginning to pull out of the parking lot, Mr. Grigsby stopped and stared in the direction of the surveillance officers and one officer noticed that Mr. Grigsby was shaking his head, "as if he knew that officers were watching him." *Id.* at ¶ 61. Mr. Grigsby drove over to the Taco Bell, and as he was pulling out of that lot, Mr. Grigsby again spotted surveillance and waited at the street entrance despite the fact there was no traffic on the street. Once he pulled out, he drove ten miles per hour under the posted speed limit, and the agents terminated surveillance. The affidavit explains that attempts to conduct regular surveillance on this organization would be "fruitless" because of their counter-surveillance efforts. In addition, the affidavit contends information obtained by physical surveillance would only be of limited evidentiary value.

The affidavit further explains that the use of undercover personnel would be unadvisable because, due to the close and secretive nature of this organization, it would be highly unlikely to succeed and very dangerous for an undercover agent to attempt to infiltrate the upper echelons of the organization. The affidavit also explains that

members of the organization are unlikely to allow non-longtime associates to be privy to the complete scope of their criminal activities.  Additionally, the affidavit points out that law enforcement officers had essentially exhausted their ability to obtain information from confidential informants.  As the affidavit makes clear, CS#2, CS#3, and CS#4 no longer had current knowledge of the activities of the organization and were not in a position to provide additional information, and no additional cooperating individuals were available to the agents.  The affidavit also explains that despite the fact that CS#1 knew numerous individuals within the drug trafficking organization, CS#1 had not been able to purchase or witness a purchase of crack cocaine or cocaine above the street level distributors.  The affidavit also describes a specific instance where "even though [Kennan] Ringgold was found inside a known narcotics trafficking location with 'crack' cocaine, marijuana, pills and cash, Ringgold didn't cooperate with officers nor did he offer any further information related to the source of these narcotics."  *Id.* at ¶ 69.  The affidavit goes on to explain that without the requested interception, it appeared highly unlikely that law enforcement will be able to identify additional co-conspirators or locations of stash houses.

The affidavit explains that issuing grand jury subpoenas to the individuals likely involved in the conspiracy would probably not be successful in accomplishing the goals of the investigation because the targets and co-conspirators would likely be uncooperative, invoke their Fifth Amendment privilege,  and/or simply alert the targets and their co-conspirators of the existence of the investigation, thus compromising it.

17

Also, the affidavit details that seeking immunity for any of the targets or co-conspirators would be unwise as it might prevent the prosecution of the most culpable members of the conspiracy, and in any event, not ensure that the witnesses would provide truthful testimony.

The affidavit further describes that conducting additional interviews of subjects or known associates would not provide sufficient information concerning the identity of the conspirators, the source of the drugs, and the details concerning financing and location of records, drugs, or other assets.  The affidavit also makes clear that such interviews would likely compromise the investigation allowing for the concealment, movement or destruction of evidence.  The cooperating defendants in this case at the time of the affidavit were no longer capable of providing the officers with current information regarding the investigation.

The affidavit explains that although pen registers are potentially useful in identifying conspirators, the investigation had not identified all the telephones used by the members of the organization.  Additionally, the usefulness of pen registers is obviously limited as they do not reveal the content of the phone calls, and some members of the organization were using telephones that were registered in other individuals' names.

Finally, the affidavit explains that search warrants would only have a limited impact on selected portions of the investigation, particularly because not all of the organization's members had been fully identified and located.  To successfully dismantle

the entire organization, the affidavit asserts that it would be better to delay until agents were prepared to arrest all key members; therefore, members would not be tipped prematurely to the investigation.  The affidavit also details the lack of success in expanding known information as the result of one search warrant executed on 727 Chestnut, Leavenworth, Kansas.

## B. Target Phone 3

The initial affidavit[13] in support is thirty pages in length and describes in detail the investigation of this organization that was believed to be distributing large amounts of cocaine and crack cocaine in the Leavenworth, Kansas and Kansas City metropolitan areas.  This affidavit, like the one supporting the application for Target Phones #1 and #2, details the basis for probable cause, the people expected to be intercepted along with their known criminal histories, and then explains why traditional methods of investigation are infeasible.  The subscriber for Target Phone #3 was Mr. Wesley's wife,

---

[13]*See* Government's Exhibit 9, Affidavit in Support of Application for Order Authorizing Interception of Wire Communications for Target Phone # 3 (dated Aug. 10, 2007).  The wiretap on Target Phone # 3 was re-authorized three times, with affidavits in support of twenty-seven, twenty-six, and twenty-six pages in length.  Each affidavit in support for continued wiretapping incorporated the previous affidavits and added information that had been gained since the previous authorization. *See* Government's Exhibit 12, Affidavit in Support of Application for Extension of Order Authorizing Continued Interception of Wire Communications for Target Phone # 3 (dated Sept. 7, 2007); Government's Exhibit 14, Affidavit in Support of Application for Second Extension of Order Authorizing Continued Interception of Wire Communications for Target Phone # 3 (dated Oct. 5, 2007); Government's Exhibit 17, Affidavit in Support of Application for a Third Extension of Order Authorizing Continued Interception of Wire Communications for Target Phone # 3 (dated Nov. 2, 2007).

Lakisha Wesley; however, the affidavit explains that Mr. Wesley was identified as the primary user of the phone.  This affidavit re-iterates that law enforcement believed Mr. Wesley to be a high-level narcotics trafficker responsible for the distribution of cocaine and marijuana in the Kansas City metropolitan area.   Through information from cooperating defendants and informants, law enforcement believed that Mr. Wesley purchased multiple kilos of cocaine and marijuana at one time, but only distributed these drugs to a small number of people, including Mr. Grigsby, Mr. Perez, and others currently unknown.

The affidavit details law enforcement's current understanding of the scope of the operation and Mr. Wesley's role in it.  For example, an interview with one cooperating defendant (CS#2) revealed that Mr. Wesley was one of the main suppliers of cocaine to the Leavenworth area.  CS#2 also gave information regarding Mr. Wesley's homes and details regarding Mr. Perez's relationship to Mr. Wesley by marriage.  CS#2 believed that Mr. Grigsby was supplied by Mr. Wesley, and CS#2 also offered that he/she had purchased 2-3 kilos of crack from Mr. Grigsby.  Another confidential cooperating source (CS#3) witnessed Mr. Wesley dropping off a kilogram and a half of powder cocaine to an individual named Randy Draper in Kansas City, Missouri.  CS#3 explained that Mr. Draper was later arrested at an airport with a large quantity of cocaine believed to have come from Mr. Wesley.    CS#3 also told law enforcement that Mr. Wesley and his associates flaunted large quantities of drugs and money, and he/she had observed Mr. Wesley with kilogram quantities of crack cocaine.  CS#3 described Mr. Wesley and his

associates as "very violent" and responsible for the distribution of a substantial portion of the cocaine in the Kansas City area. CS#4 provided information regarding the amount of cocaine Mr. Grigsby purchased at one time and also told law enforcement that Mr. Perez and Kurtz Griffin were supplied by Mr. Grigsby. Finally, CS#5 told law enforcement that Mr. Wesley sold multiple kilogram quantities of cocaine in Kansas City and described Mr. Wesley as Thomas Humphrey's "right hand man." Government's Exhibit 9, at ¶ 26.

The affidavit goes on to detail various telephone conversations intercepted from Target Phones #1 and #2 placed by Mr. Grigsby to Mr. Wesley and other co-conspirators. The affidavit also describes a controlled purchased by CS#1 from Mr. Perez at which Mr. Wesley was present.

The affidavit then explains how traditional investigative techniques have been tried and failed or appear unlikely to succeed or are too dangerous to attempt. Specifically, regarding physical surveillance, the affidavit describes numerous trash pulls from Mr. Wesley's residence, and explains that they "were compromised and no evidentiary material could be seized." *Id.* at ¶ 40. The affidavit also reiterates Mr. Grigsby's efforts to thwart physical surveillance. The affidavit concludes that further attempts at physical surveillance are "fruitless." Regarding the use of undercover police officers and agents, the affidavit explains that this organization is close-knit and secretive, and such attempts are "highly unlikely" to succeed and "very dangerous." *Id.* at ¶ 46. The affidavit reiterates the information contained within the affidavit of support

21

for wiretaps for Target Phones #1 and #2 regarding the use of cooperating individuals, again concluding that no additional cooperative individuals are currently available to law enforcement. The sections detailing the use of grand jury subpoenas, interviews of subjects or associates, pen registers, and search warrants are largely identical to the information provided in the initial affidavit in support for Target Phones # 1 and # 2.

## C. Target Phone 4

The initial affidavit[14] in support is thirty-one pages in length and describes in detail the investigation of the drug trafficking organization believed to be distributing large amounts of cocaine and "crack" cocaine in the Leavenworth, Kansas and Kansas City metropolitan areas. This affidavit, like the two previously discussed, details the basis for probable cause, the people expected to be intercepted along with their known criminal histories, and then explains why traditional methods of investigation are infeasible. The affidavit explains that Target Phone # 4 is registered to "Hard Tymes" at an address where no business by such a name exists; however, Mr. Wesley is identified as the primary user of Target Phone # 4.

---

[14]*See* Government's Exhibit 10, Affidavit in Support of Application for Order Authorizing Interception of Wire Communications for Target Phone # 4 (dated Aug. 28, 2007). The government sought re-authorization of the wiretap on Target Phone # 4 twice, with affidavits in support both twenty-eight pages in length. *See* Government's Exhibit 13, Affidavit in Support of Application for Order Authorizing Continued Interception of Wire Communications for Target Phone # 4 (dated Oct. 1, 2007); Government's Exhibit 16, Affidavit in Support of Application for Second Order Authorizing Continued Interception of Wire Communications for Target Phone # 4 (dated Oct. 31, 2007). Each affidavit in support incorporated the previous affidavits by reference and added information that had been gained since the prior authorization.

This affidavit expands the people believed to be involved in the conspiracy and details the contents of some of the phone calls already intercepted from Target Phones #1-3.  For example, several of the phone calls described are between Mr. Grigsby and Mr. Wesley discussing the poor quality of some of the cocaine and what to do with it.

The affidavit then goes on to describe how other traditional methods are infeasible either due to unlikelihood of success or danger.  For example, the affidavit describes an attempt by Mr. Wesley to conduct counter-surveillance and the difficulty in physically tracking his movements.  Government's Exhibit 10, at ¶ 42.  CS#1 also described an instance where Mr. Perez brandished a .357 handgun when Mr. Perez did not know who was following him.  *Id.* at ¶ 43. The affidavit again describes further attempts at physical surveillance without electronic surveillance as "fruitless."  There is additional information regarding a search warrant executed upon Mr. Wesley's residence at 1429 Kiowa, Leavenworth, Kansas.  In this search, officers recovered three handguns and a small amount of marijuana.  At the time of the search only Mr. Wesley's wife and three children were home, and when Mrs. Wesley called Mr. Wesley, he told her he would not come to the house.  The affidavit concludes that "executing search warrants without the benefit of additional probable cause for additional locations would result in only identifying a limited portion of the Monterial Wesley drug trafficking organization" and would alert other co-conspirators about the investigation.  The rest of the affidavit largely mimics the previous ones in its description of why the use of undercover police

officers, cooperating individuals, grand jury subpoenas, interviews of subjects or associates, and pen registers are infeasible.

**D. Conclusion**

After reviewing the entire contents of the affidavits, the court is satisfied that they provide an adequate showing of necessity for the issuance of wiretap orders for Target Phones # 1-4. The affidavits are not conclusory. They contain sufficient factual details explaining the extent to which traditional investigative techniques had already been used or not used and why use of those techniques would have been largely futile at that point. The affidavits indicate that this was a drug organization consisting of numerous individuals and large quantities of drugs. Law enforcement officers had already conducted visual surveillance, utilized confidential informants, questioned and interrogated individuals when the opportunity arose, and had utilized pen registers prior to the issuance of the wiretap orders. The government correctly points out that more overt surveillance and/or the use of grand jury subpoenas could have compromised the investigation. Similarly, the use of search warrants also could have blown the cover of the investigation without providing information concerning the scope of the organization. Using undercover agents to infiltrate the organization was also not feasible. Given the factual background of the investigation, the court is satisfied that normal investigative procedures were tried and failed or reasonably appeared to have been unlikely to succeed if tried.

As the Tenth Circuit explained most recently in *United States v. Zapata*, "[t]he

government is not required, as part of the necessity showing under § 2518, 'to exhaust all other conceivable investigative procedures before resorting to wiretapping.'" 546 F.3d 1179, 1186 (10th Cir. 2008) (quoting *Edwards*, 69 F.3d at 429). As a result, in considering challenges to wiretap orders on necessity grounds, the Tenth Circuit has upheld orders where:

> (1) several investigatory methods had been utilized prior to resort to wiretapping;
>
> (2) normal investigative techniques had been frustrated by various problems local police were unable to overcome; (3) increased visual surveillance would have increased the possibility of detection; and (4) potential witnesses were unwilling to testify in court because of fear of reprisal.

*Id.* (quoting *Edwards*, 69 F.3d at 429-430). Here, law enforcement officers attempted multiple investigatory methods; however, continued physical surveillance was thwarted and officers were concerned about revealing the existence of the investigation too soon before all three goals repeatedly named by the government at the motions hearing were accomplished. Namely, the government wanted to identify members of the conspiracy, sources of supply, and assets of the conspiracy. The government has shown that these goals could not be achieved without the use of electronic surveillance. In fact, "[t]he determination of the dimensions of an extensive drug conspiracy [has] been held to justify the use of electronic surveillance." *United States v. Johnson*, 645 F.2d 865, 867 (10th Cir. 1981). *See also United States v. Newman*, 733 F.2d 1395, 1399 (10th Cir. 1984) (citing *Johnson* to hold that an affidavit in support of a wiretap application

satisfied the necessity requirement where the prior investigation into a drug conspiracy had failed to reveal the source of the drugs and the extent of the conspiracy). Thus, issuance of the wiretap orders were warranted in order to effectively penetrate this drug trafficking organization.

IT IS THEREFORE ORDERED BY THE COURT THAT Mr. Foy's motion to suppress (Doc. 454), joined by Mr. McDaniel (Doc. 537), Mr. Trinkle (Doc. 538), Mr. Heags (Doc. 542), Mr. Perez (Doc. 570), and Mr. Goodwin (Doc. 572), is denied.

IT IS FURTHER ORDERED BY THE COURT THAT Mr. Grigsby's motion to suppress (Doc. 462), joined by Mr. Goodwin (Doc. 572), is denied.

IT IS FURTHER ORDERED BY THE COURT THAT Mr. Clark's motion to suppress (Doc. 414), joined by various defendants, including: Mr. Wesley (Doc. 450 and 451), Mr. Johnson (Doc. 455), Mr. Wallace (Doc. 516), Mr. McDaniel (Doc. 537), Mr. Trinkle (Doc. 538), Mr. Heags (Doc. 542), Ms. Temple (Doc. 549) and Mr. Goodwin (Doc. 572), is denied.

IT IS FURTHER ORDERED BY THE COURT THAT Mr. Johnson's motion to suppress (Doc. 445), joined by various defendants, including:   Mr. Wesley (Doc. 450 and 451), Mr. Johnson (Doc. 455), Mr. Wallace (Doc. 516), Mr. Trinkle (Doc. 538), Ms. Temple (Doc. 549) and Mr. Goodwin (Doc. 572), is denied.

IT IS SO ORDERED.

Dated this 18th day of February, 2009, in Kansas City, Kansas.


                                        s/ John W. Lungstrum
                                        John W. Lungstrum
                                        United States District Judge