IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| MONTERIAL WESLEY (02), | ) |
| SHEVEL M. FOY (04), | ) |
| BILLY TRINKLE (15), | ) |
| LATYSHA D. TEMPLE (20), | ) |
| KEITH McDANIEL (22), | ) |
| FRANKLIN GOODWIN, JR. (24), | ) |
| | ) |
| Defendants. | ) |

Case No. 07-20168-JWL

## MEMORANDUM AND ORDER

On February 1, 2008, a Superseding Indictment, alleging various drug trafficking offenses, was filed as to twenty-four defendants.  In Count 1, the Superseding Indictment alleged that beginning in or about January 2006 and continuing to on or about November 27, 2007, in the District of Kansas and elsewhere, the defendants conspired with named and unnamed individuals to manufacture, to possess with intent to distribute, and to distribute 50 grams or more of cocaine base "crack" and to possess with intent to distribute and to distribute five kilograms or more of cocaine, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(ii), (b)(1)(A)(iii), and Title 18, United States Code, Section 2–all in violation of Title 21, United States Code, Section 846. The Superseding Indictment alleged thirty-eight other substantive counts involving

various defendants.  On April 14, 2009, jury selection began, and seven of the original

twenty-four defendants, Monterial Wesley, Rtayvian Simpson, Shevel Foy, Billy

Trinkle, Latysha Temple, Keith McDaniel, and Franklin Goodwin, Jr., proceeded to

trial.[1]  On May 15, 2009, the jury returned its verdict.[2]  The matters presently before the

court are the various defendants' timely motions for judgment of acquittal and for new

trial.[3]  For the reasons discussed below, the court grants in part and denies in part the

_____

[1]On April 15, 2009, prior to the beginning of the parties' opening statements, one defendant, Mr. Wesley entered a plea of guilty to Counts 1, 33, 35, and 36, but proceeded to trial on the remaining counts against him (Counts 2, 17, 19, 22, 29, 34, 37, 38, and 39).

On April 30, 2009, the government concluded the presentation of its evidence, and the court granted Mr. Simpson's Motion for Judgment of Acquittal.  As a result, the jury returned verdicts for only six defendants.  At this time, the court also granted Mr. Wesley's Motion for Judgment of Acquittal as to Count 2 of the Superseding Indictment.

[2]The jury convicted Mr. Wesley on Counts 17, 19, 22, 29, 34, 37, and 38 of the Superseding Indictment; however, the jury could not reach a verdict on Count 39, which charged Mr. Wesley with possession of a firearm in furtherance of a drug trafficking crime.

The jury convicted Mr. Foy on Counts 1, 17, 22, and 29 of the Superseding Indictment, but acquitted him on Count 37, which charged Mr. Foy with using a communication facility to commit, cause, and facilitate Count 1.

The jury convicted Mr. Trinkle on Counts 1, 14, and 15 of the Superseding Indictment.

The jury convicted Ms. Temple on Count 1 of the Superseding Indictment, but acquitted her on Count 19, which charged Ms. Temple with using a communication facility to commit, cause, and facilitate Count 1.

The jury convicted Mr. McDaniel on Count 1 of the Superseding Indictment, but acquitted him on Count 34, which charged Mr. McDaniel with using a communication facility to commit, cause, and facilitate Count 1.

Finally, the jury convicted Mr. Goodwin on Counts 1 and 11.

[3]The motions are as follows: Mr. Wesley's Motion for Judgment of Acquittal (Doc. 789), Mr. Wesley's Motion for New Trial (Doc. 790), Mr. Foy's Motion for
(continued...)

motions for judgment of acquittal by Mr. Wesley, Mr. Foy, and Mr. Trinkle; however, the court denies all other motions by the defendants.

## STANDARD

Each defendant moves for judgment of acquittal. The court must uphold the jury's verdict of guilty if "'any rational trier of fact could have found the essential elements of the crime[s] beyond a reasonable doubt.'" *United States v. Urbano*, 563 F.3d 1150, 1156 (10th Cir. 2009) (quoting *United States v. Doodles*, 539 F.3d 1291, 1293 (10th Cir. 2008)). The court must "'ask only whether taking the evidence–both direct and circumstantial, together with the reasonable inferences to be drawn therefrom–in the

---

[3](...continued)

Judgment of Acquittal (Doc. 785), Mr. Foy's Motion for New Trial (Doc. 786), Mr. Trinkle's Motion for Judgment of Acquittal (Doc. 749), Mr. Trinkle's Motion for New Trial (Doc. 780), Mr. Trinkle's Motion for Judgment of Acquittal (Doc. 782), Ms. Temple's Motion for Acquittal, or in the Alternative, Motion for a New Trial (Doc. 792), Mr. McDaniel's Motion for Acquittal or, in the Alternative, a New Trial (Doc. 787), Mr. Trinkle's Motion for Judgment of Acquittal, Alternatively, Motion for New Trial (Doc. 809), and Mr. Goodwin's Motion for Judgment of Acquittal, Alternatively, for New Trial (Doc. 809). The defendants each also filed various memoranda in support of their motions. They are as follows: Mr. Wesley's Memorandum in Support of his Motion for Judgment of Acquittal (Doc. 854), Mr. Wesley's Memorandum in Support of his Motion for New Trial (Doc. 855), Mr. Foy's Memorandum in Support of his Motion for New Trial (Doc. 852), Mr. Foy's Memorandum in Support of his Motion for Judgment of Acquittal (Doc. 853), Mr. Trinkle's Memorandum in Support of his Motion for Judgment of Acquittal (Doc. 750), Mr. Trinkle's Memorandum in Support of his Motion for Judgment of Acquittal (Doc. 848), Mr. Trinkle's Memorandum in Support of his Motion for New Trial (Doc. 849), Ms. Temple's Rule 29 Motion for Judgment of Acquittal or Alternatively for a New Trial (Doc. 872), Mr. McDaniel's Suggestions in Support of his Rule 29 Motion for Judgment of Acquittal (Doc. 841), Mr. McDaniel's Suggestions in Support of his Rule 33 Motion for a New Trial (Doc. 842), and Mr. Goodwin's Brief in Support of his Motion for Acquittal or Alternatively a New Trial (Doc. 873).

light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt."' *United States v. Erickson*, 561 F.3d 1150, 1158 (10th Cir. 2009) (quoting *United States v. Hanzlicek*, 187 F.3d 1228, 1239 (10th Cir. 1999)). "'While the evidence supporting the conviction must be substantial and do more than raise a mere suspicion of guilt, it need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt."' *Erickson*, 187 F.3d at 1258-59 (quoting *United States v. Burkley*, 513 F.3d 1183, 1188 (10th Cir. 2008)).

As to the defendants' alternative motions for new trial, Federal Rule of Criminal Procedure 33 provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. "A motion for a new trial is not regarded with favor and is only issued with great caution." *United States v. Herrera*, 481 F.3d 1266, 1269-70 (10th Cir. 2007) (citing *United States v. Trujillo*, 136 F.3d 1388, 1394 (10th Cir. 1998)). The decision whether to grant a motion for new trial is committed to the sound discretion of the trial court. *United States v. Stevens*, 978 F.2d 565, 570 (10th Cir. 1992).

## ANALYSIS

## A. Conspiracy to Possess with Intent to Distribute and to Distribute Cocaine and Crack (Count 1)

*1. Venue*

Mr. Foy and Mr. McDaniel both argue that the court erred in not instructing the jury on venue for Count 1 of the Superseding Indictment. *See* Mr. Foy's Memorandum

in Support of his Motion for Judgment of Acquittal, Doc. 853, at 1; Mr. McDaniel's Suggestions in Support of his Rule 33 Motion for New Trial, Doc. 842, at 6-12; Mr. McDaniel's Suggestions in Support of his Rule 29 Motion for Judgment of Acquittal, Doc. 841, at 4-9. Mr. McDaniel is correct that "failure to instruct on venue, *when requested*, is reversible error unless it is beyond a reasonable doubt that the jury's verdict on the charged offense necessarily incorporates a finding of proper venue." *United States v. Miller*, 111 F.3d 747, 751 (10th Cir. 1997) (emphasis added); *see also United States v. Kelly*, 535 F.3d 1229, 1239 n.7 (10th Cir. 2008) (explaining that the *Miller* standard does not apply where the defendant does not request a specific venue instruction). However, in this case, none of the defendants requested such an instruction for Count 1 of the Superseding Indictment. "No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict." Fed. R. Crim. P. 30. "Failure to object to the jury charge in a timely and specific manner precludes appellate review, and the judgment will be reversed only if the trial court committed plain error." *United States v. Jimenez*, 205 Fed. App'x 656, 665 (10th Cir. 2006).

Mr. McDaniel argues that his failure to object to the jury instructions in this regard is not fatal because *Jenkins v. United States*, 392 F.2d 303 (10th Cir. 1968), allows him to preserve the argument absent an objection. In *Jenkins*, the defendant was

5

indicted in Kansas on three counts.[4]  The jury acquitted the defendant on Counts 1 and

2, but convicted him on Count 3.  *Id.* at 306.  Following this verdict, the defendant

moved for judgment of acquittal and for new trial and raised a specific objection as to

venue for the first time.  *Id.*  The Tenth Circuit held that because the first two counts

involved an implicit finding that the acts occurred in Kansas, if the defendant had been

found guilty on either Count 1 or 2, there would have been a basis for venue on Count

3.  *Id.*  As the Tenth Circuit explained, however, the jury could have convicted the

defendant on Count 3 without an implicit finding that he committed an unlawful act in

Kansas, and as a result, even though the defendant did not specifically raise the issue of

venue on Count 3 until after the verdict, the objection was timely and proper.  *Id.*  What

Mr. McDaniel does not take into account in making his *Jenkins* argument is that Count

1 of the Superseding Indictment is a conspiracy charge.  In a conspiracy case, venue is

proper in any district where the conspiratorial agreement is formed or where an overt act

in furtherance of the conspiracy is committed by *any* of the conspirators.  *United States

v. Durham*, 139 F.3d 1325, 1329 (10th Cir. 1998) (emphasis added); *see also United

States v. Magleby*, 420 F.3d 1136, 1145 (10th Cir. 2005).  The Tenth Circuit has made

clear that "[f]or the purposes of venue, the acts of any conspirator are imputed to the

other conspirators."  *Miller*, 111 F.3d at 753 n.8.  As a result, the fact that Mr. McDaniel

---

[4]The first count was for unlawfully entering a bank in Kansas; the second count
was for stealing property from the bank in Kansas; and the third count was for receiving
and possessing property knowing it to have been stolen from the bank in Kansas.  *Id.* at
306.

was acquitted of Count 34, which required an explicit finding of Kansas as the venue, and convicted of Count 1 does not raise the same venue concerns as the circumstances raised in *Jenkins*.  Given the substantial amount of evidence presented by the government of various co-conspirators' overt acts in Kansas, there is no doubt that Kansas was a proper venue for Count 1 of the Superseding Indictment.[5]

Both Mr. McDaniel and Mr. Foy also suggest that there was insufficient evidence to establish venue in Kansas with respect to Count 1 because there was no evidence that either Mr. Foy or Mr. McDaniel were ever personally present or were involved in acts in Kansas.  However, this argument misapprehends the requirements for venue in a conspiracy case.  As discussed above, venue is proper either in any jurisdiction where the conspiratorial agreement is formed or in any jurisdiction where an overt act in furtherance of the conspiracy is committed by any of the conspirators.  *Durham*, 139 F.3d at 1329.  Mr. McDaniel's and Mr. Foy's argument that they were never personally present in Kansas and never committed any acts in Kansas is not sufficient to defeat Kansas as a proper venue for Count 1 of the Superseding Indictment.  The Tenth Circuit has "upheld venue for a conspiracy charge even though the defendant had neither been

---

[5] For example, the government presented evidence of Shannon Perez's videotaped controlled sales of cocaine to the government's confidential informant; the government also presented evidence of Mr. Grigsby's extensive drug trafficking in Leavenworth, Kansas with James Heags ("Shaq") and other members of the conspiracy; and finally, the government presented evidence of Mr. Wesley's telephone calls to various other members of the conspiracy, including Mr. Perez and Michael Clark, (captured by Counts 33 and 35 to which Mr. Wesley pled guilty) where they discussed the incoming cocaine from Thomas Humphrey, Mr. Wesley's main supplier, and what prices Mr. Wesley was going to charge.

to the jurisdiction nor committed any acts there." *Miller*, 111 F.3d at 753 n.8.  In *United States v. Smith*, 692 F.2d 693, 697 (10th Cir. 1982), the court found it sufficient that the defendant's coconspirator had sold drugs in the jurisdiction and had made telephone calls to the defendant from there.  As discussed previously, the government clearly established Kansas as a proper venue for Count 1 of the Superseding Indictment.  Therefore, the court denies Mr. Foy's and Mr. McDaniel's requests for judgment of acquittal on this basis.

*2. Sufficiency of the Evidence*

Mr. Trinkle, Mr. McDaniel, and Ms. Temple all argue in their motions for judgment of acquittal that the government presented insufficient evidence to support their convictions on Count 1 of the Superseding Indictment. Mr. Trinkle's Memorandum in Support of his Motion for Acquittal, Doc. 750; Mr. McDaniel's Suggestions in Support of his Rule 29 Motion for Judgment of Acquittal, Doc. 841, at 1-4; Ms. Temple's Memorandum in Support of her Motion for Acquittal or Alternatively for a New Trial, Doc. 872.  Mr. Trinkle argues that he was a mere buyer in the drug conspiracy charged by the government, and that the jury would have had to engage in impermissible inference stacking in order to convict him of Count 1 of the Superseding Indictment.  *See* Doc. 750, at 7-18.  Mr. McDaniel argues that the government actually proved two or more conspiracies–one involving the manufacture and distribution of crack and one or more involving the distribution of cocaine–while it charged a single conspiracy.  Doc. 841, at 2.  Finally, Ms. Temple argues that at best the government's

8

evidence only established her presence or association with individuals involved in the drug conspiracy, and the government's case "merely create[d] suspicion about the possibility of [her] involvement based solely upon conjecture, speculation, and impermissible inference stacking." Doc. 872, at 10.

The jury convicted Mr. Trinkle, Mr. McDaniel, and Ms. Temple on Count 1 of the Superseding Indictment, namely, conspiracy to possess with intent to distribute and to distribute crack and cocaine. "To obtain a conviction for conspiracy, the government must prove that (1) there was an agreement to violate the law; (2) Defendant knew the essential objectives of the conspiracy; (3) Defendant knowingly and voluntarily took part in the conspiracy; and (4) the coconspirators were interdependent." *United States v. Pulido-Jacobo*, 377 F.3d 1124, 1129 (10th Cir. 2004) (quoting *United States v. Ailsworth*, 138 F.3d 843, 850 (10th Cir. 1998)). "Knowledge [of illegal activity] and presence [at the crime scene] coupled with knowing participation in the illegal drug activities are sufficient to sustain a drug conspiracy." *United States v. Reese*, 145 Fed. App'x 269, 274 (10th Cir. 2005) (alterations in original) (quoting *United States v. Coyote*, 963 F.2d 1328, 1331 (10th Cir. 1992)).

"To prove an agreement, the government need not offer direct proof of an express agreement on the part of the defendant. Instead the agreement may be informal and may be inferred entirely from circumstantial evidence." *Pulido-Jacobo*, 377 F.3d at 1129 (quoting *United States v. Lang*, 364 F.3d 1210, 1223 (10th Cir. 2004), *vacated on other grounds by Lang v. United States*, 543 U.S. 1108 (2005)). "Although 'mere association'

with conspirators is insufficient to support a conspiracy conviction, 'frequent contacts' among conspirators and 'their joint appearances at transactions and negotiations' tend to show the existence of an agreement." *United States v. Aragon*, 141 F.3d 1186, 1998 WL 166059, at *3 (10th Cir. Apr. 10, 1998) (table op.) (quoting *United States v. Evans*, 970 F.2d 663, 669 (10th Cir. 1992)); *see also United States v. Kelley*, 187 Fed. App'x 876, 884 (10th Cir. 2006) ("Although no government witness testified about an express agreement between [the co-defendants], the prosecution presented ample evidence to allow the jury to infer reasonably that such an agreement existed."). Under the essential objective element, "the government must prove that the alleged conspirator had a general awareness of both the scope and the objective of the enterprise." *Pulido-Jacobo*, 377 F.3d at 1130 (quoting *Evans*, 970 F.2d at 670). A jury may presume that "a defendant is a knowing participant in the conspiracy when he acts in furtherance of the objective of the conspiracy." *United States v. Johnson*, 42 F.3d 1312, 1319 (10th Cir. 1994); *United States v. Carter*, 130 F.3d 1432, 1440 (10th Cir. 1997). "Interdependence exists where each coconspirator's actions constitute essential and integral steps toward the realization of a common, illicit goal." *Pulido-Jacobo*, 377 F.3d at 1131 (quoting *Carter*, 130 F.3d at 1440).

Mr. Trinkle argues that he was simply a buyer and not a coconspirator in the drug conspiracy charged by the government. However, the government presented evidence–numerous recorded phone calls, Mr. Trinkle's own statement, and the testimony of several government witnesses, including Henry Grigsby, Byron Brown, and

10

Kennan Ringgold–that supports the government's position that Mr. Trinkle, while a low-end dealer, did more than simply consume the cocaine he purchased.[6]  For example, in a phone call between Mr. Grigsby and Mr. Trinkle on August 21, 2007, Mr. Trinkle asked Mr. Grigsby for a quarter (quarter ounce or seven grams of cocaine) now and a quarter later, to which Mr. Grigsby responded okay and told Mr. Trinkle to call Shaq (i.e., Mr. Heags).  *See* Government's Exhibit 180.  In a follow up phone call that same day, Mr. Grigsby called Mr. Heags and told him to grab a seven-up–a quarter ounce–for Billy (i.e., Mr. Trinkle) and to charge him $200.  *See* Government's Exhibit 181.  In a phone call between Mr. Grigsby and Mr. Trinkle from August 26, 2007, Mr. Trinkle asked Mr. Grigsby whether he was "good" (i.e., whether he had drugs available) and then discussed that they would meet up in fifteen to twenty minutes.  *See* Government's Exhibit 190.  In a phone call on August 30, 2007, Mr. Trinkle asked Mr. Grigsby if he could get a seven (a quarter ounce), and Mr. Grigsby told him to call Shaq who would take care of it.  *See* Government's Exhibit 191.  On September 3, 2007, Mr. Trinkle called Mr. Grigsby and explained that he was "trying to get a bid–250 for one," and that he was "just trying to make a couple of dollars."  *See* Government's Exhibit 321.  Officer

---

[6]The court notes that it does not discuss all of the evidence the government presented against Mr. Trinkle in support of its charge in Count 1 of the Superseding Indictment.

In addition, while the court appreciates the government's confidence in the court's familiarity with the facts presented at trial, the government should in the future explicitly identify the facts it considers supportive of each defendant's conviction, especially given the length of the trial and the time elapsed from the conclusion of the presentation of the evidence and the court's consideration of these motions.

Eric Jones testified that in his training and experience, even heavy users would only use up to an eight-ball (eighth of an ounce) of cocaine a day, and he believed–and the phone calls the government introduced supported the notion–that Mr. Trinkle was buying distribution quantities of cocaine from Mr. Grigsby.

In addition to the phone calls, the government introduced Mr. Trinkle's own statement given on the day of his arrest to Officer Jones and Special Agent Mike Holder. In this statement, Mr. Trinkle admitted that he had been purchasing quarter-ounce quantities of cocaine for about $150 from Mr. Grigsby every other day for about a year and a half. Mr. Trinkle explained he would sometimes get the cocaine from Mr. Heags if Mr. Grigsby was unavailable. While Mr. Trinkle denied purchasing cocaine from Mr. Brown, he admitted that he knew Mr. Brown sold cocaine and provided Officer Jones with a phone number that matched one law enforcement had associated with Mr. Brown.

Mr. Grigsby's testimony largely matched what the phone calls and Mr. Trinkle's statement revealed. Mr. Grigsby explained that Mr. Trinkle was a frequent–anywhere from five to six times a week–customer of Mr. Grigsby's and that he purchased on average a quarter ounce per transaction. On rare occasions, according to Mr. Grigsby, Mr. Trinkle would buy one to two ounce quantities from him. Based on the quantity Mr. Trinkle was purchasing, Mr. Grigsby testified that he assumed Mr. Trinkle was selling some of the cocaine. Mr. Brown also testified that he sold eight-ball to quarter-ounce quantities of cocaine to Mr. Trinkle and based on the amounts, he assumed that Mr. Trinkle was distributing. Finally, Mr. Ringgold's testimony directly implicated Mr.

Trinkle as a distributor as well as user.  Mr. Ringgold testified that he had personally observed Mr. Trinkle selling in various clubs in Leavenworth on approximately ten occasions.  Based on this evidence, the court is convinced that Mr. Trinkle was more than a mere consumer.[7]  "[T]he purpose of the buyer-seller rule is to separate consumers, who do not plan to redistribute drugs for profit, from street-level, mid-level, and other distributors, who do intend to redistribute drugs for profit, thereby furthering the objective of the conspiracy."  *United States v. Ivy*, 83 F.3d 1266, 1286 (10th Cir. 1996) (citing *United States v. Roberts*, 14 F.3d 502, 513 (10th Cir. 1993); *United States v. Horn*, 946 F.2d 738, 741 (10th Cir. 1991)).

In viewing the evidence presented in the light most favorable to the government, Mr. Trinkle was more than a mere user of cocaine.  The government presented evidence through the testimony of Mr. Brown, Mr. Grigsby, Mr. Ringgold, and Officer Jones from which the jury could have inferred that Mr. Trinkle was a seller as well as a consumer of cocaine.  In addition, the phone call between Mr. Trinkle and Mr. Grigsby where Mr. Trinkle states he is "trying to make some money" indicated that he was not merely a consumer of the drugs he was purchasing.  From this evidence, the jury could have reasonably found that Mr. Trinkle was a member of the conspiracy as charged, and consequently, the court denies Mr. Trinkle's motion for judgment of acquittal on Count 1 of the Superseding Indictment on the basis of insufficient evidence.

---

[7]A contention the jury necessarily rejected in convicting Mr. Trinkle on Count 1 of the Superseding Indictment as the court included a buyer-seller instruction as requested by Mr. Trinkle and Mr. Goodwin.

Mr. McDaniel argues that the government proved two or more conspiracies (one involving crack and one or more involving cocaine), rather than the one conspiracy (involving both crack and cocaine) it set out to prove.[8]  Mr. McDaniel contends that the government presented no evidence that he had any involvement with crack and therefore argues that his conviction should be set aside.  In contrast to Mr. McDaniel's assertion, a series of phone calls between Mr. McDaniel and Mr. Wesley on August 15 and August 16, 2007 indicate that Mr. McDaniel was in fact involved with crack as well a powder cocaine.  *See* Government's exhibits 169, 170, 295, 296.  In this series of phone calls, Mr. McDaniel and Mr. Wesley discussed a half kilogram of "bad dope" that Mr. McDaniel had purchased from Mr. Wesley.  Mr. McDaniel explained that he did not like to return drugs because it was bad business, but that he could not "do what he had to do with it because it was already done up."  *See* Government's Exhibit 295.  Based on this statement, Officer Jones testified that the drugs in question were crack, not powder cocaine.  From this evidence and testimony, the jury could have reasonably inferred that Mr. McDaniel was involved with both power and crack cocaine.

In addition to this series of phone calls, the government introduced several phone calls where Mr. Foy and Mr. Wesley, in the context of discussing their drug business, discussed how Mr. McDaniel owed Mr. Wesley money.  *See* Government's Exhibits 208, 209, 210, 267.  These phone calls discussing Mr. McDaniel's debt reveal that Mr.

---

[8]The court does not address all of the evidence the government presented against Mr. McDaniel in support of its charge in Count 1 of the Superseding Indictment.

Wesley was fronting Mr. McDaniel cocaine to sell and help explain the relationship between Mr. Wesley as a supplier and Mr. McDaniel as a seller.  They also reveal that Mr. McDaniel was known to several members of the conspiracy and had relationships with multiple co-conspirators.  The government also introduced a couple of phone calls in which Mr. Wesley and Mr. McDaniel discuss getting Mr. Wesley a rental vehicle so that he can transact business.  *See* Government's Exhibits 217 and 297.  Providing a clean vehicle for Mr. Wesley to meet with Mr. Humphrey is important because the conspirators would not want to attract unwanted attention from law enforcement.

The testimony of Thomas Humphrey and Daniel Tarrents also supports the government's view that Mr. McDaniel was involved in a drug conspiracy with Mr. Wesley, Mr. Foy, and others.  Mr. Humphrey testified that Mr. McDaniel had approached him in CCA and told Mr. Humphrey that he was an associate of Mr. Wesley's who had received some of the bad dope Mr. Humphrey had sold Mr. Wesley; he also said he had been at a deal where Mr. Wesley picked up cocaine from Mr. Humphrey.  From these statements, the jury could have inferred that Mr. McDaniel knew Mr. Humphrey was Mr. Wesley's supplier, and therefore, Mr. McDaniel had a general awareness of the scope and extent of the conspiracy.  Mr. Tarrents testified that he acted as a runner and had a stash house for Mr. McDaniel's cocaine distribution in Missouri. Mr. Tarrents's testimony sheds light on Mr. McDaniel's customer base in Missouri. Based on this evidence, it is clear that Mr. McDaniel was aware of the scope and extent of the conspiracy, that he had knowledge and involvement in crack as well as powder

15

cocaine, and that he had taken steps in furtherance of the conspiracy. Therefore, the government provided sufficient evidence to support Mr. McDaniel's conviction on Count 1 of the Superseding Indictment.

Ms. Temple argues that the government's evidence at best shows that she was present or associated with others who were involved in drug offenses. However, the court disagrees with her assessment of the government's evidence and finds that, based on the evidence the government presented at trial, she could have been found guilty of Count 1 on either basis charged in the Superseding Indictment–as a principal or as an aider and abettor.

The government contends its theory was that Ms. Temple was guilty as an aider and abettor to Count 1. In its consolidated response to the defendants' motions, the government points to testimony that indicated that she allowed Mr. Wesley to store drugs and money at her residence, that she allowed him to use her vehicle when conducting drug transactions, that she sometimes drove him to drug transactions, that she acted as counter-surveillance for Mr. Wesley and Mr. Foy, and that she attempted to assist Mr. Wesley in identifying the suspect in the Foy home invasion. The government argues it is clear at the very least that its evidence showed (1) someone else committed the charged crime and (2) Ms. Temple intentionally associated herself in some way with the crime and intentionally participated in it as she would in something she wished to bring about. *See* Instruction No. 27. However, the court believes that this same evidence would have allowed the jury to conclude that Ms. Temple was guilty as a principal.

In conclusion, the court denies the motions for judgment of acquittal on Count 1 of the Superseding Indictment by Mr. Trinkle, Mr. McDaniel and Ms. Temple on the basis of insufficiency of the evidence.

*3. Aiding and Abetting*

Mr. Goodwin and Mr. Trinkle object to the inclusion of an aiding and abetting instruction in association with Count 1 of the Superseding Indictment.  Mr. Goodwin argues that this instruction should not have been included because it is legally impossible for a person to aid and abet a conspiracy.  However, the Tenth Circuit has held that a defendant may be convicted as a principal or as an aider and abettor in a drug conspiracy, and thus the jury may be instructed as to the elements required for both theories.  *See United States v. Langston*, 970 F.2d 692, 705-06 (10th Cir. 1992) (sustaining a conspiracy conviction under an aiding and abetting theory).  Other circuits also support the notion that an individual can in fact aid and abet a conspiracy and that the jury should be instructed on such a theory.  *See, e.g.*, *United States v. Galiffa*, 734 F.2d 306, 309 (7th Cir. 1984); *United States v. Walker*, 621 F.2d 163, 166-67 (5th Cir. 1980); *United States v. Lane*, 514 F.2d 22, 26-27 (9th Cir. 1975).

In addition, the court included language in the aiding and abetting instruction that "[a] simple buyer-seller relationship or mere presence at the scene of a crime and knowledge that a crime is being committed are also not sufficient to establish aiding and abetting."  *See* Instruction No. 27.  This language was added to the aiding and abetting instruction to clarify that a simple buyer-seller relationship is insufficient to show an

17

individual aided and abetted a conspiracy, just as it is insufficient to show an individual was a conspirator.

The defendants in the present case were charged in the Superseding Indictment with conspiracy as a principal and under the theory of aiding and abetting the conspiracy. Consequently, it was appropriate for the court to provide the jury with instructions on both theories, and the jury could have properly found a defendant guilty under either theory.

## B. Attempt to Possess with Intent to Distribute Cocaine (Counts 17, 22, 29, and 38)

*1. Venue*

Both Mr. Wesley and Mr. Foy argue that the government failed to establish Kansas as the proper venue for Counts 17, 22, 29, and 38 of the Superseding Indictment. These counts charge Mr. Wesley and Mr. Foy with having

> knowingly and intentionally attempted to possess with intent to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a controlled substance in violation of Title 21, United States Code, Sections 846, 841(a)(1) and (b)(1)(A)(ii) and Title 18, United States Code, Section 2.

Possession with intent to distribute is a continuing crime. *See United States v. Medina*, 992 F.2d 573, 587 (6th Cir. 1993); *United States v. Uribe*, 890 F.2d 554, 559 (1st Cir. 1989); *United States v. Baskin*, 886 F.2d 383, 388 (D.C. Cir. 1989). For venue purposes, a continuing crime is properly brought in any district where the crime began, continued, or was completed. *See* 18 U.S.C. § 3237(a). A criminal attempt may be completed long before the underlying criminal act is completed. To prove an attempt, the government

must prove beyond a reasonable doubt that (1) the defendant intended to commit the crime, and (2) the defendant took a substantial step towards commission of that crime.

While the government acknowledges that a criminal prosecution for Counts 17, 22, 29, and 39 would have been proper in Missouri, it argues that it was also proper to instruct as to attempted possession with intent to distribute in Kansas even though the possession was actually completed in Missouri. *See United States v. Muhammad*, 502 F.3d 646, 655 (7th Cir. 2007) (discussing while a completed possession with intent to distribute occurred in another jurisdiction, the court held an attempt charge was proper in the district that was the venue for the conspiracy charge itself). In the present case, Mr. Wesley was a resident of Kansas, and while he often picked up his drugs from Mr. Humphrey in Missouri, a large portion of the cocaine Mr. Wesley sold was ultimately distributed in the State of Kansas. On the four occasions in question, Counts 17, 22, 29, and 38, the government contends Mr. Wesley began his activity in Kansas by setting up the transactions with Mr. Humphrey, contacting Mr. Foy and others to gather money to fund the purchase, recruiting potential buyers for the drugs, and traveling from his home in Leavenworth, Kansas to Kansas City, Missouri to pick up the cocaine and deliver the money.

For example, with respect to Count 17, the government introduced into evidence a phone call from September 5, 2007 between Mr. Wesley and Mr. Foy, in which they discussed getting money together to purchase narcotics and Mr. Foy informed Mr. Wesley that he had his part and "H," identified by several witnesses to be Mr. McDaniel,

was "finishing up" and "getting right back." *See* Government's Exhibit 197.  Based on the content of this phone call, the jury could have inferred that Mr. Wesley was getting ready to leave Leavenworth and was headed into Kansas City to meet up with his supplier to buy cocaine.  *See id.* (Wesley stated "I'm leaving my house now" and "I'm just gonna go up to the shop next to Uncle Walt's, get my shit done, and have dude come and see me there.").  This phone call represents a substantial step of preparation by Mr. Foy and Mr. Wesley to purchase narcotics, and supports Kansas as a proper venue for Count 17 due to Mr. Wesley's presence in Kansas when the call occurred.  As a result, Mr. Foy's and Mr. Wesley's motions to acquit on the basis of venue for Count 17 are denied.

With respect to Count 22, the government introduced into evidence a series of phone calls from September 13, 2007 between Mr. Wesley and others including Mr. Humphrey, Mr. Foy and Mr. McDaniel.  *See* Government's Exhibits 211, 212, 216, 217, 218.  In these phone calls, Mr. Wesley, while still at his house, began by talking to Mr. Humphrey and setting up a meeting.  *See* Government's Exhibit 211.  Then, as Mr. Wesley was getting ready to shower, he called Mr. Foy to explain "everything was peachy."  *See* Government's Exhibit 212.  Next, Mr. Wesley again spoke with Mr. Humphrey, and Mr. Humphrey asked if Mr. Wesley had "made it to the world yet," which Mr. Humphrey testified at trial meant Kansas City, and they discussed in greater detail when and where they would meet for the deal.  *See* Government's Exhibit 216. From this statement, the jury could have inferred that Mr. Humphrey knew Mr. Wesley

20

was not in Kansas City during the previous call.  Later, Mr. Wesley called Mr. McDaniel to see if he had "a rental" and asked him to call him back.  *See* Government's Exhibit 217.  Finally, Mr. Wesley again spoke with Mr. Foy and explained that "Her," who based on the information from previous calls is a reference to Mr. Humphrey, was not going to be ready until 3:30, and explained that Mr. McDaniel ("H") would be bringing a rental for Mr. Wesley to use because Mr. Wesley was on his motorcycle.  *See* Government's Exhibit 218.  Based on this series of phone calls, it is apparent that Mr. Wesley and Mr. Foy were arranging a drug deal with Mr. Humphrey, and Mr. Wesley and Mr. Foy began the offense in Kansas where Mr. Wesley was located when he was initially on the phone.   The phone calls represent substantial steps in Kansas in preparation for this deal, and consequently, the court denies Mr. Foy's and Mr. Wesley's motion for acquittal based on venue for Count 22.

With respect to Count 29, the government introduced a series of phone calls from September 28, 2007 between Mr. Wesley and Mr. Foy and Mr. Wesley and Mr. Humphrey.  *See* Government's Exhibits 225-233.  The government also presented surveillance photos of the meeting that took place at Chili's in Westport (which is in Kansas City, Missouri).  In contrast to the calls associated with the previous two counts, it is not clear from the content and context of the calls whether Mr. Wesley was in Kansas as he was making them, and therefore, it is not clear that the offense began in Kansas for venue purposes.  In addition, the surveillance only followed Mr. Wesley and Mr. Foy to locations within Kansas City, Missouri, and while the government presented

21

evidence of Mr. Wesley and Mr. Humphrey arranging and presumably completing a deal and Mr. Foy and Mr. Wesley arranging and presumably completing an exchange, none of this evidence linked any of the participants to actions in Kansas. As a result, the court grants Mr. Foy's and Mr. Wesley's motions to acquit on Count 29 of the Superseding Indictment on the basis of lack of venue.

Finally, with respect to Count 38, the government presented evidence in the form of phone calls recorded on November 26, 2007 and November 27, 2007, *see* Government's Exhibits 258, 260-268, and surveillance accomplished on November 27, 2007, all of which showed Mr. Humphrey and Mr. Wesley preparing to meet for the drug transaction at which they were both ultimately arrested. Mr. Humphrey began by asking Mr. Wesley to get some people "on deck" (or lined up to buy) and informed him the "rims in the front were 19" (the price was $19,000/kilogram). *See* Government's Exhibit 260. In response, Mr. Wesley called several individuals, including Mr. Clark, Mr. McDaniel, Mr. Perez, and Mr. Foy, to inform them he would soon have cocaine and let them know the price. *See* Government's Exhibits 261-263 and 267. Mr. Wesley pled guilty to Counts 33 and 35–communication facilitation counts involving Mr. Clark and Mr. Perez–thereby acknowledging Kansas as a proper venue for these counts. The phone calls on which these counts were based reveal Mr. Wesley lining up Mr. Clark and Mr. Perez to be ready when Mr. Humphrey delivered cocaine to Mr. Wesley. These calls represent substantial steps of preparation toward the crime charged in Count 38, and therefore, his plea of guilty to the phone counts helps establish Kansas as the proper

venue for Count 38.  In addition, law enforcement performed both aerial and ground surveillance of Mr. Wesley's journey on November 27, 2007 from Leavenworth, Kansas to the Kansas City, Missouri car wash where Mr. Wesley and Mr. Humphrey were arrested prior to transferring the cocaine from Mr. Humphrey's car to Mr. Wesley's.  As a result, the government presented sufficient evidence to support Kansas as a proper venue for Count 38, and therefore, the court denies Mr. Wesley's motion to acquit on Count 38 of the Superseding Indictment on the basis of lack of venue.

In conclusion, on the basis of improper venue, the court denies Mr. Foy's motion for judgment of acquittal on Counts 17 and 22, but grants Mr. Foy's motion as to Count 29, and the court denies Mr. Wesley's motion for judgment of acquittal on Counts 17, 22, and 38, but grants it as to Count 29.

*2. Sufficiency of the Evidence - Drug Amounts*

Mr. Wesley also argues that he is entitled to a judgment of acquittal or new trial on Counts 17, 22, 29, and 38 because the government provided insufficient evidence that Mr. Wesley attempted to possess with intent to distribute five kilograms or more of cocaine.  On Counts 17 and 22, the jury found that Mr. Wesley had attempted to possess with intent to distribute 500 grams or more but less than five kilograms of cocaine, and on Counts 29, and 38, the jury found that Mr. Wesley attempted to possess with intent to distribute five kilograms or more of cocaine.  Several witnesses, including Officer Jones and Mr. Humphrey, testified that it was Mr. Humphrey's and Mr. Wesley's normal procedure to call ahead to arrange a meeting, Mr. Humphrey would then provide the

cocaine to Mr. Wesley, and then within a few hours to a few days, Mr. Wesley would give the money to Mr. Humphrey.

With respect to Count 17, Mr. Humphrey testified and the content of the phone calls indicate that Mr. Wesley was giving Mr. Humphrey money on September 5, 2007 and no cocaine was exchanged on that day.  Given the normal procedure, it is possible that Mr. Wesley and Mr. Humphrey had met anywhere from a few hours to a few days before so that Mr. Humphrey could give Mr. Wesley the cocaine.  While the government also introduced surveillance photographs of Mr. Wesley's and Mr. Humphrey's meeting at Watson's Barbershop on September 5, 2007, these photographs did not reveal what was being exchanged that day.  Therefore, the question remains whether a jury could reasonably convict a defendant of attempted possession with intent to distribute cocaine when the cocaine had apparently been transferred already.  The government did not point the court to any authority supporting this position beyond suggesting orally when the motion was originally made at the close of its case that, given the "on or about" language of the count charged, the date is an approximation.  Therefore, given that the government presented no evidence that Mr. Wesley, Mr. Foy, and Mr. Humphrey exchanged anything but money on September 5, 2007, the court grants Mr. Wesley's motion to acquit on Count 17 of the Superseding Indictment.  The court also grants an acquittal on Count 17 with respect to Mr. Foy on this same basis.[9]

_____

[9]The court grants this acquittal for Mr. Foy on Count 17 recognizing that he did not raise this issue in his written motion or memorandum in support for judgment of
(continued...)

With respect to Count 22, Mr. Humphrey testified and the content of the phone calls indicate that, when Mr. Wesley and Mr. Humphrey met at the Chili's on September 13, 2007, Mr. Humphrey was selling cocaine to Mr. Wesley.[10]  Again, law enforcement officials were able to capture surveillance photographs of the exchange and the government introduced the photographs into evidence.  One photograph reveals Mr. Wesley removing a bag from Mr. Humphrey's vehicle.  *See* Government's Exhibit 33. Mr. Humphrey testified that this photograph confirmed Mr. Wesley received cocaine from Mr. Humphrey on September 13, 2007.  The crime of possessing a controlled substance with the intent to distribute has three elements: (1) possession, (2) knowledge, and (3) the intent to distribute.  *United States v. Winder*, 557 F.3d 1129, 1137 (10th Cir. 2009) (citing *United States v. Delgado-Uribe*, 363 F.3d 1077, 1084 (10th Cir. 2004)). As discussed previously, an attempt has two elements: (1) intent and (2) a substantial step toward the commission of the offense.  Therefore, the amount of cocaine is not an element the government must prove to establish the offense of attempted possession with intent to distribute.  The amount of cocaine at issue is relevant for sentencing under the principle of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), because the sentencing statute imposes increased maximum penalties based on the quantity of the substance.  *See* 21

---

[9](...continued)
acquittal.

[10]However, the government did not ask and Mr. Humphrey did not testify about the amount of cocaine he sold to Mr. Wesley on September 13, 2007.

U.S.C. § 841(b).[11]   However, the amount of cocaine is irrelevant, as long as it is a distribution amount, to whether a defendant is guilty of the crime of possession with intent to distribute.  Therefore, the court denies Mr. Wesley's motion to acquit and for a new trial for Count 22 on this basis.

With respect to Count 29, the court has already granted Mr. Foy's and Mr. Wesley's motions to acquit on this count on the basis of lack of venue, and as a result, the court will not discuss whether the government presented sufficient evidence to show that Mr. Wesley had attempted to possess with intent to distribute five kilograms or more of cocaine on September 28, 2007.

Finally, with respect to Count 38, the government presented sufficient evidence that Mr. Wesley attempted to possess with intent to distribute five kilograms or more of cocaine.  In the phone calls leading up to the meeting between Mr. Wesley and Mr. Humphrey, Mr. Humphrey explained that he was bringing a "handful" to Mr. Wesley. Mr. Humphrey testified at trial that a "handful" meant five kilograms of cocaine.  In a later phone call, Mr. Humphrey discussed picking up the "kids," which he testified at trial meant kilograms of cocaine.  In addition to the phone calls leading up to the meeting, the government introduced into evidence the actual cocaine and the materials

_____

[11]The evidence does reveal that Mr. Humphrey, Mr. Wesley and Mr. Foy only dealt in distribution amounts of cocaine, and therefore the court did not need to give a lesser included offense instruction.  *See United States v. Lacey*, 86 F.3d 956, 970 (10th Cir. 1996) (lesser included offense instruction not appropriate where quantities were sufficient for distribution and too great for simple possession); *United States v. Burns*, 624 F.2d 95, 104 (10th Cir. 1980) (lesser included offense instruction should be given where evidence could support conviction for either distribution or possession).

in which the cocaine was packaged that law enforcement seized from Mr. Humphrey's car upon Mr. Wesley's and Mr. Humphrey's arrest on November 27, 2007.  The cocaine was packaged in five separate blocks that were wrapped in plastic wrap and black electrical tape.  While the total amount of cocaine was 4957 grams, and thus less than five kilograms, it is clear from the phone calls and Mr. Humphrey's testimony that Mr. Wesley attempted to possess five kilograms or more of cocaine.[12]  Therefore, the court denies Mr. Wesley's motion to acquit and for a new trial with respect to Count 38 of the Superseding Indictment.

In conclusion, the court grants a judgment of acquittal for Mr. Foy and Mr. Wesley on Count 17, and denies Mr. Wesley's motion for a judgment of acquittal on Counts 22 and 38.[13]

## C. 21 U.S.C. 843(b) Telephone Counts (Counts 11, 14, 15, 19, 34, 37)

*1. Sufficiency of the Evidence - Venue*

At the close of the government's evidence, several of the defendants, including Mr. Goodwin, Mr. Trinkle, and Mr. Wesley, moved for judgment of acquittal with respect to the § 843(b) telephone facilitation counts as they argued the government had

---

[12]In any case, as discussed above, the court recognizes that the amount of cocaine is not an element the government needs to prove beyond a reasonable doubt to prove Mr. Wesley guilty of attempted possession with intent to distribute cocaine.

[13]The court does not need to reach the issue of whether the government presented sufficient evidence of an attempt to possess with intent to distribute cocaine on Count 22 as the court already granted Mr. Wesley's and Mr. Foy's motions for judgment of acquittal on the basis of improper venue.

failed to provide sufficient evidence that Kansas was the proper venue for these charges. At that time, the court retained this issue under advisement explaining that it planned on instructing the jury on venue as it was a question of fact that must be found by a preponderance of the evidence, and if any defendant was convicted, the court would revisit the issue post-trial.   Mr. Goodwin, Mr. Trinkle, and Mr. Wesley re-raise this issue post-trial as each was convicted on at least one § 843(b) count.[14]

While there appears to be no Tenth Circuit law directly on point, other circuits make clear that with respect to venue for § 843(b) telecommunication counts, venue is proper both where the call is placed and where the call is received.  *See, e.g.*, *Andrews v. United States*, 817 F.2d 1277, 1279 (7th Cir. 1987) ("Neither the language of section 843(b) nor its legislative history make a distinction between placing and receiving a call . . . section 843(b) proscribes a continuing offense and, as a result, the crime is committed both where the call originates and where it is received."); *United States v. Barnes*, 681 F.2d 717, 724 (11th Cir. 1982) (holding that "a 843(b) offense is 'committed' for venue purposes both in the district where the call was made and in the district where the call was received"); *see also United States v. Cordero*, 668 F.2d 32, 43-44 (1st Cir. 1981).  The government must prove venue by a preponderance of the

---

[14]In fact, Mr. Trinkle does not re-raise this issue in his written motions or memoranda in support.  However, because the court retained this issue under advisement and explicitly stated that it would review the factual record as to any defendants who were ultimately convicted of a § 843(b) offense, the court will address this issue with respect to Mr. Goodwin, Mr. Trinkle, and Mr. Wesley.

evidence, rather than beyond a reasonable doubt. *Kelly*, 535 F.3d at 1233 (citing *United States v. Byrne*, 171 F.3d 1231, 1234 (10th Cir. 1999)).[15]

Mr. Goodwin, Mr. Trinkle, and Mr. Grigsby all lived in Leavenworth, Kansas. As to Mr. Goodwin and Mr. Trinkle, no evidence was ever presented that they left Leavenworth to transact business, and there was ample evidence that buyers frequently came to Leavenworth to transact business with Mr. Grigsby, for example, Donnie and Jamicah Johnson. In the phone call that forms the basis for Count 11, Mr. Goodwin asked Mr. Grigsby for a two-way soft. *See* Government's exhibit 175. Mr. Grigsby then explained that he would call Mr. Goodwin back as soon as he got in town, and Mr. Goodwin asked what the ticket or price was so he could have it ready when Mr. Grigsby arrived. From this conversation, the jury could have inferred that the town Mr. Grigsby referred to was Leavenworth, and consequently, Mr. Goodwin, at the very least, was in Kansas when the call was made. Therefore, the government did provide sufficient

---

[15]The court would note that the government obviously was not considering this issue as it solicited the testimony of Mr. Grigsby. He could have easily clarified whether he was in the State of Kansas when he received these phone calls from Mr. Goodwin and Mr. Trinkle. He also could have clarified whether Mr. Trinkle was aware he was calling Mr. Grigsby's cell phone.

In addition, the government did itself no favors when it declined to marshal the evidence it did present with respect to venue on these phone counts. Instead of directing the court to the evidence it did present, the government merely concluded that "the jury would have been required to find, by a preponderance of the evidence that the call was made or received in Kansas in order to find the respective defendants guilty. A review of the calls in question establish [sic] that venue was sufficiently established with regards to Counts 11 (Goodwin), 19 (Wesley), 34 (Wesley) & 37 (Wesley)." Government's Consolidated Response to Defendants' Post-Conviction Motions, Doc. 918, at 17.

evidence of Kansas as the proper venue for Count 11.  In the phone call that forms the basis for Count 14, Mr. Grigsby and Mr. Trinkle first discussed whether Mr. Brown had talked to Mr. Grigsby about Mr. Trinkle's buying habits.  *See* Government's Exhibit 190. Then Mr. Grigsby explained that he had not been answering Mr. Trinkle's phone calls because he was at home sick and that he could not get a hold of Shaq because Shaq had lost his phone.  At the conclusion of the call, Mr. Trinkle asked Mr. Grigsby if he would "be good in about an hour or so" and they agreed to meet up in fifteen to twenty minutes. As previously discussed, the question of whether someone is "good" means whether he or she has drugs available.  Given Mr. Grigsby's comment that he had not been answering his phone that day or the day before because he had been home sick, the jury could have inferred that Mr. Grigsby was at home in Leavenworth when he received this call from Mr. Trinkle.  Therefore, the government did provide sufficient evidence of Kansas as the proper venue for Count 14.  In the phone call that forms the basis for Count 15, Mr. Trinkle asked if he could get a "seven" and Mr. Grigsby responded by telling him to call Shaq.  *See* Government's Exhibit 191.  Other than the general basis that Mr. Trinkle lived in Leavenworth, Kansas and the fact that no evidence was presented that he left Leavenworth to transact business, this call provides no clues as to the location of either participant.  Consequently, the government did not provide sufficient evidence of Kansas as the proper venue for Count 15, and the court grants Mr. Trinkle's judgment of acquittal on Count 15 on this basis.

With respect to the phone counts involving Mr. Wesley (Counts 19, 34, and 37), Mr. Wesley's co-defendant in each of these counts was acquitted by the jury.[16] The same general statement that applied to Mr. Grigsby, Mr. Goodwin, and Mr. Trinkle does not apply to Mr. Wesley because the government presented a great deal of evidence that Mr. Wesley, despite owning a home in Leavenworth, Kansas, was constantly traveling into Kansas City, Missouri to transact business with Mr. Humphrey, Mr. Foy and others and to visit one of his girlfriends, Ms. Temple, who lived in Missouri. The phone calls that form the basis of Counts 19, 34 and 37 provide no hints as to whether Mr. Wesley was in Kansas when placing or receiving these calls. For example, the phone call that forms the basis of Count 19 provides no indication as to Mr. Wesley's location when he received the call, and it is clear from the content of the call that Ms. Temple was in her own home in Missouri when she placed the call. In addition, Mr. Wesley's phone calls with Mr. Foy which took place in close proximity to his call with Ms. Temple do not help establish whether Mr. Wesley was in Kansas when he received this call from Ms. Temple. Similarly, the phone call that forms the basis of Count 34 makes clear that Mr. McDaniel was at home in Columbia, Missouri, but it provides no clues as to Mr. Wesley's location. Finally, the phone call that forms the basis of Count 37 reveals that Mr. Foy was actually out of the country as he placed the call to Mr. Wesley, and the content of the phone call indicates that Mr. Wesley was probably in Kansas City,

---

[16]In Count 19, Ms. Temple was acquitted; in Count 34, Mr. McDaniel was acquitted; and in Count 37, Mr. Foy was acquitted.

Missouri as he received it.  The government also failed to present any surveillance evidence that would substantiate Mr. Wesley's geographic location when placing or receiving these phone calls.  As a result, the government did not provide sufficient evidence of Kansas as the proper venue for Counts 19, 34, and 37, and the court grants Mr. Wesley's judgment of acquittal on Counts 19, 34, and 37 for lack of venue.

In conclusion, the court denies Mr. Goodwin's motion for acquittal on Count 11, denies Mr. Trinkle's motion for acquittal on Count 14, but grants it as to  Count 15, and grants Mr. Wesley's motion for acquittal on Counts 19, 34, and 37.

## 2. Sufficiency of the Evidence - Use of Cellular Telephone

Mr. Trinkle argues that the government provided insufficient evidence to show he used a cellular telephone while committing the acts charged in Counts 14 and 15 of the Superseding Indictment, and that he is entitled to a judgment of acquittal on these counts.  However, it is clear from the evidence that Mr. Trinkle was calling Mr. Grigsby on Target Phone #2 (one of his cell phones) in the calls associated with these counts. Mr. Grigsby testified that Target Phone #2 was one of his cell phones and Officer Jones testified to this fact as well. The government in the Superseding Indictment only alleges that "a" cellular telephone was used to facilitate the conspiracy.  Consequently, if Mr. Trinkle knew he was calling Mr. Grigsby on his cell phone, then the government presented sufficient evidence for Counts 14 and 15.   Based on a totality of the conversations between Mr. Trinkle and Mr. Grigsby, it is apparent that Mr. Trinkle was

aware he was calling Mr. Grigsby on his cell phone, given some of the comments made during various intercepted phone calls.  In addition, the jury could have inferred from its common sense and the circumstantial evidence that Mr. Trinkle was aware he was calling Mr. Grigsby on his cell phone.  As a result, Mr. Trinkle's motion for a judgment of acquittal on Counts 14 and 15 is denied on this basis.

## D. Remaining Issues

*1.* Batson *Challenge*

Mr. Wesley reasserts his *Batson v. Kentucky*, 476 U.S. 79 (1986),[17] challenge regarding the government's peremptory challenge of venire-person Leslie Lavender-White, an African American woman, and argues that he should be granted a new trial because the government improperly struck Ms. Lavender-White.  *See* Mr. Wesley's Memorandum in Support of his Motion for New Trial, Doc. 855, at 5-6.  The court previously ruled on the record on this issue and finds that Mr. Wesley raises no new arguments or authority that alter the court's thinking.[18]  Therefore, the court again finds

---

[17]*Batson* provides a three-step process for a trial court to follow in determining whether a peremptory challenge has been exercised on the basis of race.  *United States v. Smith*, 534 F.3d 1211, 1225 (10th Cir. 2008).  "First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination."  *Id.* at 1225-26 (quoting *Synder v. Louisiana*, 128 S. Ct. 1203 (2008)).

[18]Specifically, the government stated that it struck Ms. Lavender-White because she indicated that a number of the companion defendants' names sounded familiar to her
(continued...)

that the government's reasoning was not racially motivated and denies Mr. Wesley's request for a new trial on this basis.

## 2. Admission of Wiretapped Phone Calls

Mr. Wesley also argues that he should be granted a new trial based on his and his co-defendants' prior arguments that the court should not have admitted the wiretapped phone calls. *See* Mr. Wesley's Memorandum in Support of his Motion for New Trial, Doc. 855, at 6. As Mr. Wesley does not direct the court to any new arguments or authority in support of this assertion, but rather incorporates all previous arguments and briefs pertaining to the admission of the wiretapped phone calls, the court stands by its ruling on the record. Therefore, the court denies Mr. Wesley's request for a new trial on this basis.

## 3. Juror Misconduct

Mr. Foy and Mr. Wesley both argue that they should be granted new trials due to a claim of juror misconduct that occurred on day five and was discovered on day six of jury deliberations. *See* Mr. Foy's Memorandum in Support of his Motion for New Trial, Doc. 852, at 2-8; Mr. Wesley's Memorandum in Support of his Motion for New Trial,

---

[18](...continued)
and because she had a son who had been tried and convicted on charges related to crack cocaine and while she stated she agreed with the conviction, she disagreed with the sentence. Keeping in mind that "[a] race-neutral explanation is simply an explanation, no matter how implausible, that is based on something other than the race of the juror[,]" *United States v. Barrett*, 496 F.3d 1079, 1105 (10th Cir. 2007), the court is satisfied that the government met its burden of providing race-neutral reasons for removing Ms. Lavender-White from the jury.

Doc. 855, at 6.  The court was notified by the jury foreperson of several issues regarding a juror who had used a stopwatch to time how long it took him to retrieve an item from the floorboard of his car and had also brought a tape measure into the deliberation room. Based on the court's questioning of both the foreperson and the juror in question, it was clear that the stopwatch "experiment" involved the consideration of Mr. Wesley's guilt as to Count 39 of the Superseding Indictment–a count for which the jury was unable to reach a unanimous verdict.[19]  Based on these same discussions, it was also clear that the

_____

[19]The experiment was first brought to the court's attention by the foreperson raising a concern with the bailiff regarding a juror doing outside research.  The foreperson was instructed to put this concern in written form to notify the court, and she wrote : "Judge, a juror has done outside research by timing with a stopwatch how long it takes to retrieve an item from the floorboard of a car while sitting at red lights.  This has been brought into the jury room and shared with other jurors."  After receiving the note, the court shared this information with the parties and conferred with them on the best course of action.  At this point, it was decided that the court would discuss in chambers with the court reporter present the situation with the foreperson and then the juror in question to find out more details concerning the extent of the experiment.

In its discussion with the foreperson, the court discovered that around the afternoon break the day before, the juror in question took a stopwatch out of his pocket and told his fellow jurors that he had placed a checkbook on the floor of his car and timed his retrieval of it at around 3 to 3.5 seconds.  He also stated that he believed this information should inform the rest of the jury about matters pertaining to whether or not the gun might be something that would assist in a drug transaction.  The foreperson also told the court that no other juror had indicated that he or she had engaged in any activity that would run afoul of the admonition and nothing else had happened before this time to indicate the particular juror in question had tried anything else along these lines.  The foreperson also indicated that the juror's experiment passed without much more than the juror making his statement, and that the other jurors did not seem to react or respond to this information.

In its discussion with the juror in question, the court began by explaining that the foreperson had raised a concern regarding his experiment with his stopwatch and checkbook and clarifying that such experimentation was not appropriate given the

(continued...)

35

tape measure had never been used in any way concerning the jury's deliberations.

Following the court relaying these discussions to the defendants and defense counsel, Mr. Wesley moved for a mistrial of the entire case, a mistrial as to Count 39, or in the alternative, the replacement of the juror in question with one of the alternate jurors.[20] The court, explaining that it believed this was an isolated incident borne out of a mistake concerning how far the admonition about research and investigation went as the juror was attempting to check his own common sense perception, denied each of the requests. While acknowledging that this experiment was contrary to the admonition, the court also pointed out that the precise amount of time it might take to retrieve an item from under a car seat was largely irrelevant to the factors set out for the jury regarding the determination of Count 39. The court then called the jury back into open court and reiterated and expanded upon the admonition it had been giving throughout the trial and the jury's deliberations. The court also explained that to the extent any information had been brought to the jury's attention that was outside the scope of the jury deliberation

---

[19](...continued)
court's admonition. The court then questioned whether the juror's experiment was limited to this one instance, and the juror indicated that it was. The juror also explained that no one else was involved in his experiment and that he had not used his tape measure in any way.

[20]Mr. Foy joined in Mr. Wesley's request that the juror be replaced with an alternate, and Mr. Trinkle requested that the juror be excused and the jury proceed as a body of eleven. The other defendants joined in Mr. Wesley's request that a mistrial be granted, or in the alternative, the juror in question be replaced with an alternate.

process, the jury should disregard that information as it was not evidence in the case and was not something that could be relied upon in the jury reaching its verdict.

The jury ultimately did not reach a verdict as to Count 39 of the Superseding Indictment–possession of a firearm in furtherance of a drug trafficking crime. Given the jury's lack of a verdict on the one count to which the juror's experiment pertained, it appears difficult, if not impossible, for Mr. Wesley and Mr. Foy to argue that they were unduly prejudiced by the introduction of this information into the jury's deliberations. Mr. Foy is correct in pointing out that the juror's experiment and his sharing of the information he gathered amounted to extrinsic information. *See United States v. Navarro-Garcia*, 926 F.2d 818, 821 (9th Cir. 1991). Mr. Foy argues that a rebuttable presumption of prejudice results from the jury being exposed to extrinsic information not presented at trial. *See Remmer v. United States*, 347 U.S. 227, 229-30 (1954). However, this presumption would seem to apply to the specific count in question, and the government is correct in pointing out that the defendants have done nothing to explain how the experiment influenced any other aspect of the deliberations or verdicts.

Such experiments may violate a defendant's constitutional rights if the defendant can show that the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Doan v. Brigano*, 237 F.3d 722, 736 (6th Cir. 2001); *see also Durr v. Cook*, 589 F.2d 891, 892 (5th Cir. 1979) (holding that jury foreman's out-of-court experiment to test defendant's self-defense theory required an evidentiary hearing to

determine whether it substantially influenced the jury's verdict); *Marino v. Vasquez*, 812 F.2d 499, 505 (9th Cir. 1987) (holding that out-of-court experiment by a juror may implicate a defendant's constitutional rights if the experiment substantially influences the jury's verdict).  The Tenth Circuit has held that jurors may use common sense and ordinary and uninflammatory props to reenact the crime in the privacy of the jury room.[21] *See United States v. Abeyta*, 27 F.3d 470 (10th Cir. 1994) (discussing a juror's use of a pocketknife to reenact the incident in question); *see also United States v. Hephner*, 410 F.2d 930, 936 (7th Cir. 1969) ("Jurors must be given enough latitude in their deliberations to permit them to use common experiences and illustrations in reaching their verdict.").

Mr. Foy also argues that the court should have inquired further with the other jurors to determine the full impact of the juror misconduct.  However, no one suggested this further inquiry at the time the issue was raised, and both the foreperson and the juror in question explained to the court that this experiment was limited and not discussed by the other members of the jury.  The court believed that under all the circumstances any individual inquiry with the other jurors would only serve to highlight the experiment. In addition, the court brought the entire jury back into open court to expand on its prior admonition and to explain that any information that had been introduced outside the

---

[21]The government pointed out that this juror's experiment could have just as easily been accomplished within the jury room without a stop watch.

scope of the admonition should be ignored and not enter into the thinking of the jurors when arriving at a verdict.

Finally, Mr. Foy argues that the court committed error by not excusing the juror in question and replacing him with an alternate juror.  The authority Mr. Foy cites for this argument acknowledges the trial court's unique position in evaluating whether the juror should remain.  *See United States v. Barrett*, 496 F.3d at 1102 (stating that the district court has broad discretion over whether to dismiss jurors because the "decision whether to excuse a juror rests on whether the juror can remain impartial, a matter of fact uniquely within the observation of the trial court") (quoting *United States v. McVeigh*, 153 F.3d 1166, 1185 (10th Cir. 1998)).  In this instance, the court determined that the juror in question had not acted in deliberate opposition to the court's restrictions, but rather out of a misunderstanding of the limitations placed on his common sense deliberations.  Therefore, the court determined it was unnecessary to dismiss the juror as the court was confident he could remain impartial in reaching his verdict.   In conclusion, the court denies Mr. Foy's and Mr. Wesley's requests for a new trial on the basis of juror misconduct.

*4. Prejudicial Joinder*

Mr. McDaniel and Mr. Trinkle both raise the concern that the court's refusal to grant severance of their cases from that of the other co-defendants resulted in prejudicial joinder.  *See* Mr. McDaniel's Suggestions in Support for his Rule 33 Motion for New

Trial, Doc. 842, at 12-13; Mr. Trinkle's Memorandum in Support of his Motion for New Trial, Doc. 849, at 1-3. Specifically, both argue that Mr. Wesley's guilty plea to Counts 1, 33, 35, and 36–following voir dire, but prior to opening statements by the parties–suggested to the jury that his co-defendants were also guilty on the conspiracy charged in Count 1 of the Superseding Indictment. In addition, Mr. Trinkle argues that he was prejudiced by his joinder with his co-defendants because he requested that a supplemental question be added to the verdict form where that the jury could have indicated whether it was convicting each defendant as a principal or as an aider and abettor on Count 1. However, the court required such a request to be unanimous from the defendants, and Mr. Trinkle was the only defendant who wanted this supplemental question. Mr. McDaniel argues again that the government proved two or more conspiracies, rather than the one charged and that he was prejudiced by the inclusion of evidence presented by the government in support of these multiple conspiracies.

Rule 8(b) of the Federal Rules of Criminal Procedure provides that defendants may be charged together "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Fed. R. Crim. P. 8(b). "There is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993). Especially in a conspiracy case, like the one involved here, there is a preference that defendants who are charged together should be tried together. *United*

*States v. Small*, 423 F.3d 1164, 1181 (10th Cir. 2005) (citing *United States v. Hack*, 782 F.2d 862, 870 (10th Cir. 1986). *See also United States v. Iiland*, 254 F.3d 1264, 1269-70 (10th Cir. 2001) (citing *United States v. Edwards*, 69 F.3d 419, 434 (10th Cir. 1995)). "'In deciding on a motion for severance, the district court has a duty to weigh the prejudice resulting from a joint trial of co-defendants against the expense and inconvenience of separate trials.'" *Small*, 423 F.3d at 1181 (quoting *Hack*, 782 F.2d at 870). Federal Rule of Criminal Procedure 14 permits a district court to grant a severance of defendants if "it appears that a defendant or the government is prejudiced by a joinder." Fed. R. Crim. P. 14. In *Zafiro*, the Supreme Court explained:

> [A] district court should grant severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. Such a risk might occur when the evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant. For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty. When many defendants are tried together risk of prejudice is heightened. Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice.

506 U.S. at 539 (internal citations omitted). While it is true that a district court is more likely to determine separate trials are necessary when the risk of prejudice is high, the Tenth Circuit has made clear that "'less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.'" *United States v. Rodriguez-Aguirre*, 108 F.3d 1228, 1234 (10th Cir. 1997) (quoting *Zafiro*, 506 U.S. at 539). "Rule 14 leaves

the determination of risk of prejudice and any remedy for such prejudice to the sound discretion of the district court." *Id.* (citing *Zafiro*, 506 U.S. at 541).

The court decided to inform the jury of Mr. Wesley's change of plea before the start of opening statements because Mr. Wesley was entitled to argue–as he subsequently did–that he had pled guilty to the charges for which he was guilty and was proceeding to trial on the charges for which he contended he was not guilty. To counteract any possible prejudice from the jury's knowledge of Mr. Wesley's guilty plea, the court instructed the jury at the time of this notification that they were "not to consider [it] in any respect as to any of the other counts against Mr. Wesley or any of the counts against any of the other defendants." The court went on to explain that "each of the counts as to each defendant is a stand alone charge, and each defendant is entitled to proceed as he or she sees fit and . . . merely the entry of a plea, whether it be guilty or not guilty, is not evidentiary in any respect." The court also included in its final instructions to the jury a further admonition that the jurors "should not consider [Mr. Wesley's] plea of guilty to certain offenses charged as evidence against him with respect to the remaining counts involving Mr. Wesley" and "also should not consider Mr. Wesley's plea of guilty to certain offenses as evidence against his remaining codefendants." The Tenth Circuit has repeatedly held that "'less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.'" *Rodriguez-Aguirre*, 108 F.3d at 1234 (quoting *Zafiro*, 506 U.S. at 539). Therefore, the court finds that Mr. Trinkle and Mr. McDaniel

42

were not unduly prejudiced by the court's decision not to sever them from their remaining co-conspirators as the court's limiting instructions were sufficient to cure any risk of prejudice.

Mr. Trinkle also argues he was prejudiced by the court's refusal to sever him because he wanted a supplemental question added to the verdict form that his other co-defendants would not agree to include.  In its response, the government points out that its theory of the case was that Mr. Trinkle was a conspirator, not an aider and abettor to the conspiracy.  Because the government produced sufficient evidence to support its theory of the case, as discussed above, Mr. Trinkle was not prejudiced by the lack of the supplemental jury question.

Mr. McDaniel argues that he was prejudiced by the evidence relating to the distribution of crack and the numerous weapons to which he contended he had no connection.  However, as discussed more extensively above when the court set out the evidence of Mr. McDaniel's involvement in the conspiracy, the government did present evidence that Mr. McDaniel had knowledge and involvement with crack as well as powder cocaine.  In addition, this argument appears to be a spillover argument by which the court remains unpersuaded.  The Tenth Circuit has found that "[n]either the mere allegation that defendant would have a better chance of acquittal in a separate trial, nor a complaint of the 'spillover effect' . . . is sufficient to warrant severance." *United States v. Powell*, 982 F.2d 1422, 1432 (10th Cir. 1992); *see also United States v. Cardall*, 885

F.2d 656, 668 (10th Cir. 1989); *United States v. Hack*, 782 F.2d at 870. "When

sufficient evidence is presented to connect the defendant to the conspiracy charged, his

argument that severance is required due to the overwhelming evidence against co-

defendants is without merit." *United States v. Espinosa*, 771 F.2d 1382, 1409 (10th Cir.

1985). In addition, potential "spillover" can be cured with proper limiting instructions

at trial. *See Zafiro*, 506 U.S. at 539 (noting trial court's use of limiting instructions will

often serve to cure any risk of prejudice caused by joint trial); *United States v. Emmons*,

24 F.3d 1210, 1219 (10th Cir. 1994) (concluding jury instructions eliminated any alleged

spillover effect of disproportionate evidence presented against co-defendant). Therefore,

the court denies Mr. Trinkle's and Mr. McDaniel's requests for a new trial due to

prejudicial joinder.

*5. Evidence from Alleged Illegal Stop of Mr. McDaniel*

Mr. McDaniel argues that he is entitled to a new trial because the government

used evidence obtained from an illegal stop. *See* Mr. McDaniel's Suggestions in Support

of his Rule 33 Motion for a New Trial, Doc. 842, at 1-6. Mr. McDaniel argues the

evidence from the November 27, 2007 car stop should be suppressed for two reasons:

(1) law enforcement stopped his vehicle without probable cause, and (2) law

enforcement searched his vehicle without his consent while he was handcuffed and

standing outside it. However, Mr. McDaniel failed to preserve this objection as he did

not object contemporaneously with the introduction of the evidence and withdrew his

motion to suppress prior to the court ever holding an evidentiary hearing on the matter. In addition, the court is unconvinced the stop, even as described by Mr. McDaniel, would merit the exclusion of evidence given the Tenth Circuit's recent ruling in *United States v. McCane*, 2009 WL 2231658 (10th Cir. July 28, 2009).

According to Mr. McDaniel, law enforcement performed a stop on his vehicle on November 27, 2007 without probable cause and then proceeded to execute a warrantless search of the vehicle and cell phone recovered from the vehicle. From this search, Mr. McDaniel contends the government discovered for the first time his name and the cell phone number 816-359-2335. According to Mr. McDaniel, the government never would have connected his identity to the phone calls it ultimately attributed to him at trial or connected him to Danny Tarrents without obtaining this evidence from the car stop.

In his motion for new trial, Mr. McDaniel provides no further argument to guide the court on the nature of the car stop. Instead, he merely makes the conclusory assertion that the stop was absent probable cause. Prior to trial Mr. McDaniel filed a Motion to Suppress Evidence (Doc. 352) and a Motion for an Order Compelling Discovery (Doc. 408); however, Mr. McDaniel withdrew both motions before the court ever held a hearing on the matter. In addition, Mr. McDaniel filed a Motion in Limine (Doc. 650) in which he sought to hold the government to its position not to use material gained from the car stop. The government responded by again asserting that it did not acquire any information during the vehicle stop that it was going to use in its case-in-chief.

However, when the government introduced Mr. McDaniel's cell phone number as 816-359-2335 and had Mr. Tarrents testify–the two things Mr. McDaniel insists the government could not have produced at trial without the vehicle stop–Mr. McDaniel raised no objection that the evidence was obtained from a car stop absent probable cause, nor did he raise the issue with the court that the government was in breach of its agreement not to use such information.  In addition, the government contends it never presented any evidence from the car stop on November 27, 2007, and the court agrees that the government never directly presented any witnesses to testify about the car stop in question.

Mr. McDaniel also argues that even if law enforcement had probable cause to stop his vehicle, the recent ruling in *Arizona v. Gant*, 129 S. Ct. 1710 (2009), requires the suppression of any evidence from the search of the vehicle. While Mr. McDaniel is correct *Gant* would seem to apply to a situation where Mr. McDaniel was already under arrest and in handcuffs prior to the officer's search of the car, *United States v. McCane*, 2009 WL 2231658 (10th Cir. July 28, 2009), makes clear that the exclusionary rule will not apply "when law enforcement officers act in objectively reasonable reliance upon the settled case law of a United States Court of Appeals." In *McCane*, the Tenth Circuit applied the good faith exception to the exclusionary rule and allowed the inclusion of evidence seized in violation of the new rule set out in *Gant*.   Therefore, even if Mr. McDaniel is correct that the police executed a search of his vehicle absent his consent,

46

a fact never established as Mr. McDaniel withdrew his motion to suppress, the Tenth Circuit's holding in *McCane* saves the evidence–if the government truly did present anything from the car stop of Mr. McDaniel–from exclusion. As a result, Mr. McDaniel is not entitled to a new trial on this basis.

IT IS THEREFORE ORDERED BY THE COURT THAT Mr. Wesley's Motion for a New Trial (Doc. 790) is **denied**, and his Motion for Judgment of Acquittal (Doc. 789) is **denied in part and granted in part**. The court grants Mr. Wesley a judgment of acquittal on Counts 17, 19, 29, 34, and 37.

IT IS FURTHER ORDERED BY THE COURT THAT Mr. Foy's Motion for New Trial (Doc. 786) is **denied**, and his Motion for Judgment of Acquittal (Doc. 785) is **denied in part and granted in part**. The court grants Mr. Foy a judgment of acquittal on Counts 17 and 29.

IT IS FURTHER ORDERED BY THE COURT THAT Mr. Trinkle's Motion for Judgment of Acquittal (Doc. 749) is **denied**; his Motion for New Trial (Doc. 780) is **denied**; and his Motion for Judgment of Acquittal (Doc. 782) is **denied in part and granted in part**. The court grants Mr. Trinkle a judgment of acquittal on Count 15.

IT IS FURTHER ORDERED BY THE COURT THAT Ms. Temple's Motion for Acquittal, or in the Alternative, Motion for a New Trial (Doc. 792) is **denied**.

IT IS FURTHER ORDERED BY THE COURT THAT Mr. McDaniel's Motion for Acquittal or, in the Alternative, a New Trial (Doc. 787) is **denied**.

IT IS FURTHER ORDERED BY THE COURT THAT Mr. Goodwin's Motion for Judgment of Acquittal, Alternatively, Motion for New Trial (Doc. 809) is **denied**.

IT IS SO ORDERED.

Dated this 14th day of August, 2009, in Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge